**In re Glyndon BRYANT, Debtor.**

**Glyndon BRYANT and Edward M. Mazze, Trustee, Plaintiffs,**

**v.**

**Richard H. WOODLAND and Reginald D. Lundy, Defendants.**

**Bankruptcy No. 85–02472F.**
**Adv. No. 88–2254F.**

United States Bankruptcy Court, E.D. Pennsylvania.

July 24, 1989.

Susan DeJarnatt, Community Legal Services, Philadelphia, Pa., for the plaintiff/debtor, Glyndon Bryant.

William J. O'Dair, Philadelphia, Pa., for the defendant, Richard H. Woodland.

Michael M. Baylson, U.S. Atty., Virginia R. Powel, Asst. U.S. Atty., Philadelphia, Pa.

Edward Mazze, Furlong, Pa., Trustee.

## MEMORANDUM OPINION

BRUCE I. FOX, Bankruptcy Judge:

This adversary proceeding brought by the debtor attempts to avoid a post-petition transfer of real property of the estate. The plaintiff raises two arguments: that the transfer was made in violation of 11 U.S.C. § 549(a), and that there was no valid transfer of ownership as defendant Richard H. Woodland took the property by forged deed. Defendant Woodland responds that the deed was not forged and that, in any event, he is a *bona fide* purchaser taking for value and thus has a valid post-petition transfer pursuant to § 549(c). The complaint also alleges that the conduct of defendant Reginald D. Lundy towards the plaintiff/debtor violated her rights secured by the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201–1 *et seq.*, entitling her to an award of damages. The factual underpinning of the dispute is as follows.

1. Debtor's counsel of record was Joseph Bodoff, Esquire, whose name the debtor obtained through the Philadelphia Bar Association's Lawyer Referral Service. It appears that he is not connected in any respect to this controversy.

2. Mid–Penn may have been a second mortgage holder, but the evidence does not show this clearly.

3. Shortly thereafter, on September 4, 1986 the debtor's plan was confirmed; the bankruptcy

### I.

Plaintiff Glyndon Bryant purchased the property in dispute at 1612 North 62nd Street, Philadelphia in 1975 with her late husband, who apparently died in 1982. At some point in 1985 the plaintiff had fallen behind in mortgage payments and her medical and utility bills. She decided to file for bankruptcy—in large part to save her house from foreclosure. She filed a chapter 13 bankruptcy petition on June 14, 1985.[1] The original mortgage that the debtor obtained on the property was in the amount of $13,000.00; the debtor owned no other real estate.

Under the terms of her plan the debtor was to pay, as she recalled in her testimony, $87.00 per month to the chapter 13 trustee, and to make current mortgage payments directly to Fidelity Bank and to Mid–Penn Consumer Discount Company.[2] She made payments at least until 1986 to the trustee, but stopped making payments to the mortgage company in December, 1985. In August, 1986 the Federal National Mortgage Association (which, no doubt, had acquired the mortgage from Fidelity Bank) obtained relief from the automatic stay.[3]

The mortgagee may well have put this property up for a sheriff sale as the debtor testified that in February, 1987 she received a number of letters from various lawyers trying to solicit her business because her property was up for foreclosure. Among the letters she received was one from defendant Lundy and, as his office was closer to her home than the others, she called him.[4]

Lundy, a real estate agent, went to see the debtor at her home after she had communicated with him by phone. According

has not yet been dismissed but the chapter 13 case was converted to chapter 7 in August 1988.

4. The plaintiff testified that she spoke with a number of "other attorneys" but rejected their counsel as they all asked for more money than she could afford. She may well have made payments to two persons, in the amounts of $600.00 and $90.00, in an unavailing attempt to save her home.

to the debtor, she told Lundy at this meeting in February, 1987 that she was interested in selling the house in order to avoid the foreclosure sale; he then told her that he could purchase the home from her and rent it back to her, with an option to buy after a number of years. Exhibit P–1 is composed of two pages; the first is entitled "Agreement of Sale of Real Estate," and represents an agreement to sell the subject premises between Lundy and the debtor, dated February 4, 1987. It calls for a sale price of $100.00, with settlement to be made on or before April 10, 1989, and states that it is being purchased subject to a first mortgage of $13,210.00 and with an option for the debtor to purchase 50% of the property back from Lundy under a "cotenancy agreement."

The second page is a copy of a document that carries the title "Sales on Clearance Agreement." Also signed by Lundy and the debtor[5] and dated February 4, 1987, this sheet states Lundy's agreement to buy the debtor's "interest in lien of record effecting the real property" at issue; the sum of $100.00 was to be placed in escrow by Lundy "as a deposit as the full purchase price of 13,210.97 [sic] for said promissory note...." This offer was made subject to Lundy's ability to "obtain a new 1st [mortgage and] giving the seller 50% ownership under new [mortgage] per co tenancy agreement." Ex. P–1.[6]

According to the debtor, it was her belief that she was to pay Lundy $271.00 per month, and then she would be able to purchase the house. She did not testify as to the terms under which she would obtain ownership; nor did she realize, apparently, that she was enabled to purchase back only 50% of her former interest.[7]

Defendant Lundy met again with the debtor in April, 1987 and told her that he was either unable or unwilling to honor the agreement of February 4, whereby the debtor would remain in the premises and have the right to repurchase her interest (or part thereof) in the house. He told her he would have to sell the house in order to satisfy the mortgage, and that she would have to vacate the premises. He thus apparently introduced to her an agreement of sale, which she admits signing, that calls for sale of the premises to Lundy for the sum of $500.00, settlement to occur on or before June 24, 1987. This document, admitted as Ex. P–2, states that the property is being purchased subject to the existing first mortgage. The seller is allowed, under its terms, to "remain in property until they can relocat [sic] to rented property or a property they are trying to purchase. After two months a fair rental fee of $250.00 will be paid with a month to month base."[8]

The debtor further testified that she signed no other document in April, 1987 concerning these premises, and that Lundy did in fact pay her $500.00 in July, 1987. At the April meeting Lundy stated that he wanted "her deed," meaning, according to the debtor, the deed that the debtor held to the property. The debtor testified that in April, 1987 she handed Lundy the deed that she and her late husband received when they purchased the house. The purpose behind giving Lundy the deed was to help him "sell the house much faster." [N.T. at 28.]

The debtor testified that she fully intended to sell the house, that she told Lundy as early as February, 1987 she wanted to sell it, and that she asked Lundy to sell the

---

5. The debtor testified that her signature was on this document on pages one and two; she stated that someone else had gone over her signature found on page one, implying, I assume, that someone was trying to learn how to forge her signature. [N.T. at 14.]

6. The relationship of these two pages was not made clear at trial; it was not established that the pages were intended to be incorporated as one document.

7. Debtor's testimony did not reach this limitation on the buy back; instead, she seemed to assume that she would be entitled to purchase back the entire property, and that she did not intend to release her interest to Lundy even though in P–1, the 50% ownership limitation is boldly handwritten in two prominent locations.

8. This condition placed a duty on the debtor to pay Lundy $250.00 per month if she stays in the premises longer than two months.

house for her. Lundy came into possession of the house key, of which fact she was aware and to which she did not object. She also knew that Lundy brought at least one potential buyer to her house to inspect the premises, to which she did not object.

Exhibit P–3 is a deed, recorded with the City of Philadelphia's Department of Records, dated July 6, 1987 between the debtor as grantor and defendant Woodland, the grantee. For the stated consideration of $25,000.00 this deed passes title to Woodland in trust for his children. The debtor claims that it is not her signature on this deed, and that she in fact never signed the document.[9] She claims that she never received the stated consideration for the property; the only money she realized was the $500.00 payment from Lundy who, I note, signed the deed in his capacity as notary public, affirming by sworn statement the signature of Glyndon Bryant. The debtor apparently was first alerted to some impropriety in the deed by a Mr. Brooks in August, 1987. [N.T. at 31–32.] This portion of her testimony was undeveloped. The debtor obtained the deed in May, 1988 from the Recorder of Deeds [N.T. at 21].

In July, 1987, while the debtor was still inhabiting the premises, Woodland came to her home and, apparently, spoke to her personally. [N.T. at 96–98.][10] The debtor testified that she knew then that Woodland had purchased the home and intended to move there as early as possible that month. [N.T. at 19.] She also acknowledged that she received no money from Woodland. [N.T. at 21.]

The debtor vacated the premises in late July and moved into a home owned by Lundy at 6034 Cedar Avenue, Philadelphia. She lived there for a few months, paying rent, until Lundy evicted her and she moved to her current address. She esti-

mated that the fair market value of her home on 62nd Street was $23,000.00 in 1987, based upon a statement of a real estate broker; the debtor states in her complaint that she was advised by her mortgage company that its mortgage has been satisfied.

After the debtor vacated the subject property she returned periodically to pick up her mail. She met Woodland at the house in October, 1987; other members of Woodland's family apparently met her on other visits. She testified that she and Woodland did speak about Lundy, and about the fact that Lundy had not paid her. [N.T. at 35.]

A witness who was qualified as a handwriting expert testified to his belief that it was more likely than not that the signature on Ex. P–3 was that of the debtor [N.T. at 66]. His opinion was based on handwriting exemplars obtained in February, 1989, Ex. D–2; he compared photocopies of these exemplars with photocopies of earlier exemplars, Ex. P–4, P–5 and P–6 (obtained in late 1986 and late 1987) with a photocopy of the deed in question. He acknowledged that it is much more difficult to authenticate a photocopy than an original, but he nonetheless found and explained what he considered to be sufficient indicia to conclude that the deed signature is authentic.

Woodland's testimony showed that he visited Lundy in May, 1987 for the purpose of purchasing a house.[11] Lundy took him to visit, among others, the house on 62nd Street. They were allowed into that house by "a little girl" [N.T. at 81], and Woodland inspected the premises for approximately one-half hour. Woodland signed an agreement of sale on this property, Ex. D–3, on May 14, 1987. This agreement names Real Estate Carver Realty, Inc. as the registered owner, and calls for a total consid-

---

**9.** Exhibits P–4, P–5 and P–6 are exemplars of her signatures in November, 1986 and November, 1987.

**10.** The debtor's testimony contradicts the fact of this meeting, but she does acknowledge that, prior to vacating the premises, she spoke to either defendant Woodland or his daughter on the telephone. [N.T. at 19, 20, 30.]

**11.** He testified that his friend John Brooks referred him to Lundy, and accompanied him to Lundy's office in May. Again, Mr. Brooks was not shown to play a role of any additional significance.

eration of $24,000.00. Written approval of the seller was to be obtained on or before May 18, 1987, and settlement was to be made by July 7, 1987. It is specifically noted on the agreement that this is a cash transaction, and the property is being purchased in an "as-is" condition. The buyer's signed approval is witnessed by Lundy; there is no signature approving this contract of sale on behalf of the seller.

Woodland credibly testified that he paid $25,000.00 to Lundy. *See also* Ex. D–5 (receipt dated May 28, 1987 for "1612 N. 62 St., Payment in full," signed by Lundy). Exhibit D–8 is an estimate of closing costs prepared by Lundy for Woodland. It iterates the sale price of $24,000.00 and lists costs for other items including title insurance, recording deed and mortgage, notary fees, transfer taxes, taxes and a non-refundable credit report. Clearly, there was no title insurance provided and no mortgage to record. The total amount of closing costs is listed as $1,487.00.

Woodland testified that in mid-July, 1987 (before his move-in date of July 28) he went to the house and spoke with the debtor, telling her that he had purchased the house and that he understood she was to have vacated the premises by July 7. She complained, Woodland stated, that Lundy had "tricked" her [N.T. at 97]. Apparently she told Woodland that the house would be vacant on July 27. On this representation Woodland arranged for furniture to be delivered to the house on that date; the debtor, however, was still in the premises and the furniture had to be returned. She did move out the following day, July 28.

Woodland credibly testified that he was unaware of the plaintiff's bankruptcy filing, and that he first learned of it by virtue of this lawsuit. He stated that he received his copy of the deed, Ex. D–9, from his enigmatic friend Brooks in October, 1987.[12] He testified that he thought, in July, that he was purchasing the house from Lundy and that he did not learn of the debtor's ownership interest until a later date in July. He acknowledged that he never gave money to the debtor or to either the chapter 13 or chapter 7 trustee.[13] Woodland testified that this was his first purchase of real estate, and that he did not understand the purpose of a settlement or closing. He stated he did not see the deed before October, 1987 either in blank or prepared, even though he admitted that it was his signature on the deed, at page 2.[14]

■ Defendant Lundy has failed to respond to this lawsuit or otherwise appear. The complaint seeks damages against this defendant for his alleged violations of state law, the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201–1 *et seq.*, and the debtor now seeks default judgment against this defendant. As this matter (at least concerning defendant Lundy) is a non-core proceeding, only a recommendation of default may be entered. *See generally Granfinanciera, S.A. v. Nordberg (In re Chase & Sanborn Corp.)*, —— U.S. ——, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989).

## II.

■ The debtor's request that the sale be avoided, and that the estate recover the property, is governed in the first instance by 11 U.S.C. § 549(a), which allows a trustee[15] to avoid a post-petition transfer of estate property that is not authorized under Title 11 or by the court, or that is

---

**12.** The deed was brought to the Department of Records for recordation on August 25, 1987. There was no explanation of why Woodland received his copy in October.

**13.** The debtor converted her bankruptcy to chapter 7 in August, 1988.

**14.** Woodland testified that he has made extensive repairs to the property since moving in. Exhibits D–11 through D–25 reflect money he spent on repairs and for appliances and furniture.

**15.** The debtor asserts her right to seek to avoid this transfer, pursuant to 11 U.S.C. § 522(h). My disposition of this proceeding makes unnecessary any consideration of the continued vitality of § 549(a) post-confirmation. Here, the transaction occurred after the debtor's chapter 13 plan was confirmed, thus triggering the provisions of 11 U.S.C. § 1327(b). It is also unnecessary to consider the effect, if any, upon the applicability of § 549(a) caused by the post-transfer conversion of this case to chapter 7.

authorized under §§ 303(f) or 542(c) (unless the provisions of § 549(b) or (c) apply). The defendant does not seriously dispute that the instant transfer satisfies the conditions of subsection 549(a), but rather argues that the transfer may not be avoided, due to the provisions of § 549(c). The Third Circuit Court of Appeals, in *In re Ward,* capsulized the provisions of § 549(c):

> Subsection (c) provides an exception [to the application of § 549(a)] for good faith purchasers who (1) are ignorant of the bankruptcy, (2) pay fair market value for the property, and (3) perfect their title under applicable law so as to defeat a subsequent bona fide purchaser before a notice or copy of the bankruptcy is filed with the appropriate authority.

837 F.2d 124, 126 (3d Cir.1988). This subsection thus represents an exception to the principle that actions taken in violation of the automatic stay are void. *See In re Ward; In re Purnell,* 92 B.R. 625 (Bankr. E.D.Pa.1988); *In re Stephen W. Grosse, P.C.,* 68 B.R. 847 (Bankr.E.D.Pa.1987). Given the importance of the automatic stay to bankruptcy proceedings, the general rule that post-petition transfers are invalid, and the limited purpose of § 549(c) (to protect the innocent purchaser from an unscrupulous debtor, *see* 4 *Collier on Bankruptcy* ¶ 549.03[3] (15th ed. 1988)), "the provisions of this subsection must be strictly construed." *In re Purnell,* 92 B.R. at 628 (*quoting In re Ward,* 837 F.2d at 127). The burden of proof is shouldered by defendant Woodland, who seeks to uphold the validity of this post-petition transfer.

Bankr. Rule 6001. *See In re Watson,* 65 B.R. 9, 11 (Bankr.C.D.Ill.1986).

▆ The usual challenges to the validity of § 549(c) are not present in the case *sub judice.* The defendant clearly paid fair market value for the property, having in fact paid more than the debtor's own estimate of that value. Neither does the debtor contend that Woodland failed to perfect his interest before a notice or copy of the bankruptcy was filed with the appropriate authority. *See* 21 P.S. § 351; *In re Walker,* 67 B.R. 811 (Bankr.C.D.Cal.1986). Finally, as I find that Woodland was ignorant of the bankruptcy at all times relevant, he has satisfied all aspects of 11 U.S.C. § 549(c). *In re Ward,* 837 F.2d at 127 n. 7.[16] Thus, the debtor is unable to claim a remediable violation of § 549(a).

▆ Additionally, however, the plaintiff argues that a valid transfer of ownership did not occur inasmuch as Woodland took his interest by forged deed. Certainly, under Pennsylvania law, a forged deed is incapable of passing interest.[17] *See, e.g., Zimmer v. Zimmer,* 457 Pa. 488, 326 A.2d 318 (1974); *Montrenes v. Montrenes,* 355 Pa.Super. 403, 513 A.2d 983 (1986); *Warehouse Builders & Supply, Inc. v. Perryman,* 215 Pa.Super. 413, 257 A.2d 349 (1969). The burden rests upon the debtor to show by clear and convincing evidence that the signature of "Glyndon Bryant" as grantor in the deed to Woodland is a forgery. *Warehouse Builders & Supply, Inc. v. Perryman.*[18] This elevated standard is required under applicable Pennsylvania law in order to rebut the presumption of due execution and acknowledgment of a

---

**16.** While Lundy may have had knowledge of the bankruptcy, under the circumstances I cannot impute this knowledge to Woodland. *Compare In re Adams,* 86 B.R. 867 (Bankr.E.D.N.C.1988) (unusual circumstances surrounding purported *bona fide* purchaser's bid at foreclosure sale allowed court to impute knowledge of bankruptcy; further, the purchaser did not buy for "present fair equivalent value.").

**17.** State law is determinative of the issue of whether a deed has been forged, and the effect this forgery has on the deed's ability to pass effective title. *See, e.g., Perry v. O'Donnell,* 749 F.2d 1346, 1353 (9th Cir.1984) (in bankruptcy trustee's action to quiet title, allegation that a

deed in chain of title was void due to forgery to be decided under California law); *In re Orosco,* 93 B.R. 203, 207 (9th Cir. BAP 1988) (parties in agreement that document was forged; state law determines effect of that document); *Matter of Mickler,* 50 B.R. 818, 827 (Bankr.M.D.Fla.1985) (same). *Cf. Hockett v. Larson,* 742 F.2d 1123 (8th Cir.1984) (Iowa law applied to determine validity of forged deed in diversity); *In re Chandler,* 76 B.R. 927 (Bankr.E.D.N.Y.1969) (involving debtors' purported signatures on Powers of Attorney).

**18.** The court noted that the burden was to be met by a showing of a "preponderance of clear and convincing evidence."

deed with proof of a forgery. *See Roberts v. Washington Trust Co.*, 313 Pa. 584, 170 A. 291, *cert. denied*, 292 U.S. 608, 54 S.Ct. 778, 78 L.Ed. 1469 (1934); *Burke v. Burke*, 240 Pa. 379, 87 A. 960 (1913); *Warehouse Builders & Supply, Inc. v. Perryman.*

■ The plaintiff's case on the issue of forgery depends solely upon her testimony that the signature was not hers. Under the circumstances I cannot find that her bald declarations constitute clear and convincing evidence of forgery, especially where the surrounding events do not support that conclusion.

The debtor clearly stated that her intent was to sell the house, and her own account of the events of the months of July through December, 1987 conforms to that intent. She allowed Lundy possession of her house key and permitted potential buyers to inspect her home, all without objection. She spoke with Woodland both before and after she vacated the premises, knowing all along that he had purchased the property and was asserting his ownership. She did not object to his right to own or occupy the premises, but complained only of Lundy's dealings with her. These actions comport with the debtor's goal of selling the premises. She assisted Lundy in every way to achieve this goal, and showed no reason why she would have refused to sign over a deed to the premises. Simply put, the debtor presented no evidence to indicate a need for Lundy to have obtained her signature by fraud, or to have forged her signature. Her continual cooperation with him would have made this subterfuge unnecessary. In this context, and without evidence supporting her declaration of forgery, it would be difficult to conclude that the debtor has shown by even a preponderance of the evidence that the signature was forged.

There is other evidence which further weakens debtors' position. For example, I note that the debtor's testimony regarding Lundy's April, 1987 request for "her deed" becomes internally consistent as a whole when this request is understood to refer to her grant of deed to a buyer, as opposed to the deed which granted title to the plaintiff. Copies of recorded deeds are easily obtained at City Hall in Philadelphia, and Lundy would have no need to obtain either the original or a copy from the plaintiff. Had Lundy intended to pass the plaintiff's title to a third party without plaintiff's knowledge he probably would not have taken any action that would alert the plaintiff to his scheme. If, on the other hand, the plaintiff wanted Lundy's aid in selling the house, as she testified she did, it is entirely reasonable to believe that she would have cooperated by signing a deed in blank as grantor, thus giving him "her deed."

Finally, the handwriting expert credibly testified that the disputed signature was that of the plaintiff, and my own examination of the signature (compared with the exemplars in evidence) leads me to concur in his judgment. *United States v. Clifford*, 704 F.2d 86 (3d Cir.1983); *In re Koch*, 83 B.R. 898, 903 (Bankr.E.D.Pa.1988). In sum, I cannot conclude on the evidence that the signature on the deed of property to Woodland is a forgery, necessitating avoidance of his interest.[19]

### III.

■ Plaintiff has requested default judgment against defendant Lundy, as provided by F.R.Civ.P. 55 (incorporated in this adversary proceeding by Bankr.R. 7055). As this defendant has clearly failed to plead or otherwise appear and defend against the claims made against him, a recommendation to the District Court of the default entry and judgment is proper. *E.g., Commodity Futures Trading Com'n v. American Commodity Group Corp.*, 753 F.2d 862 (11th Cir.1984).

---

**19.** Given this disposition of Woodland's interest in the property I need not reach his cross claim for damages against Lundy, and the question of whether the plaintiff is barred from bringing this suit under the doctrine of laches. *But see Hicks v. Saboe*, 521 Pa. 380, 555 A.2d 1241 (1989). Additionally, as I find that the deed in question was not forged and is valid, I do not address the argument of whether defendant Lundy acted as plaintiff's agent, to entitle defendant Woodland to keep the property in the face of an invalid deed. *Scott v. Purcell*, 490 Pa. 109, 415 A.2d 56 (1980).

A hearing date will be set for the purpose of receiving evidence in order to ascertain and then recommend the amount of damages, including attorneys' fees. *Hunt v. Inter–Globe Energy, Inc.,* 770 F.2d 145 (10th Cir.1985); *Systems Industries, Inc. v. Han,* 105 F.R.D. 72 (E.D.Pa.1985).

An appropriate order shall be entered.

### ORDER

AND NOW, this 24 day of July, 1989, plaintiffs' complaint seeking to avoid a post-petition transfer of real property of the debtor's estate is DENIED. Judgment is entered in favor of defendant Woodland.

A hearing on the issue of damages to be assessed against defendant Reginald D. Lundy shall be held in Bankruptcy Courtroom # 1, Room 3714, U.S. Court House, on August 10, 1989, at 10:00 A.M. Upon conclusion of the hearing, a recommendation as to the entry of default and default judgment shall be made.