**In re Louis STEINBRECHER, Elizabeth Steinbrecher, Debtors.**

**Louis STEINBRECHER, Elizabeth Steinbrecher, Plaintiffs,**

**v.**

**MID–PENN CONSUMER DISCOUNT CO., Defendant.**

**Bankruptcy No. 88–11724F.**
**Adv. No. 88–2147F.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Jan. 5, 1990.

Henry J. Sommer, Community Legal Services, Inc., Philadelphia, Pa., for debtors, Louis A. Steinbrecher, Jr., Elizabeth M. Steinbrecher.

Arthur Matausow, Wissow, Odza, Steckiw & Gindhart, Philadelphia, Pa., for defendant, Mid–Penn Consumer Discount Co.

Edward Sparkman, Philadelphia, Pa., Standing Chapter 13 Trustee.

## MEMORANDUM OPINION

BRUCE I. FOX, Bankruptcy Judge:

The debtors, Louis and Elizabeth Steinbrecher, have initiated an adversary proceeding challenging a secured proof of claim filed by Mid–Penn Consumer Dis-

count Company. The claim was filed in the amount of $8,441.11 and is based upon a series of loan agreements which began in August 1985 between these parties. The debtors contend in their complaint that the claim of Mid–Penn is unsecured because the value of the collateral is less than the sum total of prior liens. 11 U.S.C. § 506(a), (d). *See generally Gaglia v. First Federal Savings & Loan Association,* 889 F.2d 1304 (3d Cir.1989). The debtors also allege that this creditor violated provisions of the federal Truth-in-Lending Act (TILA), 15 U.S.C. §§ 1601 *et seq.,* as well as violated provisions of Pennsylvania's usury and unfair trade practices statutes. They seek to rescind the loan transactions, recover damages both statutory and actual, and have the unsecured claim of Mid–Penn reduced or eliminated. Mid–Penn opposes all relief sought with one exception: it concedes that its claim should be classified as unsecured due to the provisions of § 506(a), (d). Therefore, what is before me now is to determine Mid–Penn's allowed unsecured claim and whether any damage judgment in favor of the debtors is warranted.

### I.

The underlying facts are much simpler than the analysis of the legal issues.

In August 1985, the debtors decided that certain repairs and improvements to their home were needed. They invited All–Star Remodelers to provide them with an offer to perform the necessary work. The All–Star cost was $2,970.00, Ex. P–13, a sum which the debtors could only afford by financing. All–Star then obtained certain financial information from the debtors and submitted that to the defendant, Mid–Penn Consumer Discount Co. Mid–Penn had been a prior regular source of financing of All–Star home repair customers.[1]

Mid–Penn then conducted its own analysis of the information, obtained a title and credit report concerning the debtors, ob-

---

1. The parties differ on how frequently All–Star called upon Mid–Penn to provide financing for its customers. For purposes of resolving this dispute, neither the number of such financings nor the relationship of these entities is material.

tained appraisal information concerning the value of the debtors' residence (which did not require an actual inspection) and informed All–Star of its decision to finance, subject to certain conditions. The debtors, who were unfamiliar with Mid–Penn, were subsequently informed that they could obtain financing of the home repair contract by this entity. They were then taken by an All–Star employee to Mid–Penn's offices on August 21, 1985. Once there they were notified of the loan conditions (e.g., their home would serve as collateral for the loan; the residence had to be insured against damage with the lender as loss payee) and they agreed to immediate financing by Mid–Penn.

All loan documents were signed that day, including the proceeds checks which were made payable to the debtors. One check, in the amount of $2,970.00, was endorsed by them and distributed by Mid–Penn to All–Star upon completion of its work on the debtors' home. Another check, in the amount of $69.09, was also endorsed that day by the debtors and mailed to them approximately three days later. Part of the loan proceeds went to record a mortgage in favor of Mid–Penn against the debtors' home; another portion was paid by Mid–Penn to Sidney Rosenfeld, Inc. for fire insurance on the residence with Mid–Penn as loss payee.

The loan called for payments of $115.00 monthly for 48 months, beginning October 5, 1985. The debtors made all required monthly payments through May 1986. On May 23, 1986, the loan was refinanced. The debtors received $1,037.35 in new funds and agreed to repay Mid–Penn $152.00 per month for 48 months beginning July 5, 1986. A portion of the proceeds went to Mid–Penn to record a new mortgage, since the home was still serving as collateral, and to satisfy the old one. This mortgage satisfaction occurred on July 25, 1986. Again, property insurance on the realty was a precondition for this loan.

Two additional refinancings occurred. On January 14, 1987 the debtors entered into a new loan agreement with Mid–Penn on terms similar to the prior loans. They received additional funds of $561.31 and were then obligated to repay the debt at the rate of $170.00 per month for 48 months, beginning February 5, 1987. They again paid Mid–Penn to record a new mortgage and satisfy the old one. This mortgage satisfaction occurred on February 11, 1987.

The fourth loan (third refinancing) occurred on February 22, 1988. The debtors received $290.70 in new funds and agreed to repay Mid–Penn $170.00 per month for 48 months beginning April 5, 1988. The previous mortgage was satisfied on March 17, 1988.

In Appendix A to this memorandum opinion I note certain additional aspects of these loan transactions. For example, the disclosed annual percentage rates ranged from 27% to 27.58%. The disclosed amounts financed ranged from $2,197.60 to $3,200.80. The significance of these disclosures, and others, shall be detailed below.

Finally, the record before me shows that the debtors made all required payments to Mid–Penn on each of the four loans through April 5, 1988. On April 19, 1988, the debtors ceased making loan payments and sent a letter to Mid–Penn declaring their election to rescind all four loan agreements and demanding that Mid–Penn take all necessary steps to do so, including vacating its remaining mortgage on the debtors' realty. Mid–Penn replied by stating that the debtors no longer had any right to rescind, and it refused to comply with the debtors' demands.

On May 18, 1988, the debtors filed a voluntary petition in bankruptcy under chapter 13. Mid–Penn filed a secured proof of claim in the amount of $8,441.11 on July 12, 1988. The debtors then initiated the instant adversary proceeding to challenge this proof.

## II.

Although the debtors' claims against Mid–Penn overlap to some degree, they may broadly be classified into three groups. First, the debtors contend that this creditor violated the provisions of TILA as to each and every loan transac-

tion, which entitles them to rescind all four agreements and which yields recoupment and an affirmative recovery due to statutory and actual damages. Among the alleged violations are misdisclosure of the true finance charge and annual percentage rate, misdisclosure of the security interest taken, misdisclosure of the debtors' recision rights, and misdisclosure of repayment terms.

Second, the debtors argue that the initial loan transaction involved borrowing sums for home improvement work. They assert that the loan agreement should have been governed by the provisions of the Pennsylvania Home Improvement Finance Act (HIFA), 73 P.S. §§ 500–101 *et seq.* Not only could the applicability of HIFA yield various protections to these borrowers which were not included in the loan documents they signed, but the interest ceiling for such loans is considerably lower than the finance charge assessed by this lender. As a result, they claim that the loan agreements were usurious and seek statutory treble damages as a result.

Finally, the debtors maintain that certain lender practices—not complying with HIFA, not satisfying prior mortgages promptly, refinancing loans repeatedly, or not informing customers that less expensive borrowing might be achieved from Mid–Penn (or others) by structuring the loans differently—violate the provisions of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (generically known as an unfair or deceptive act or practice law, or UDAP), 73 P.S. §§ 201–1 *et seq.* UDAP violations and usury violations may yield treble damages, *see* 73 P.S. § 201–9.2(a); 41 P.S. § 503, and the debtors request such an award.

The usury and UDAP claims are conceptually and factually complicated. For example, only the first loan agreement in August 1985 involved the use of loan proceeds for home repairs. All the other loan agreements involved refinancings of prior loans with the new loan proceeds generally being paid to the borrowers or to the lender for repayment of the prior outstanding balances. If HIFA should have been applicable to the first loan, the debtors assume that it would also be applicable to refinancings. *Accord* 73 P.S. § 500–305.

In addition, the applicability of HIFA to the first loan agreement (and possibly subsequent agreements) depends upon a careful analysis of that statute, another loan statute known as the Pennsylvania Consumer Discount Company Act, 7 P.S. § 6201 *et seq.*, and decisions such as *In re Joyce*, 41 B.R. 249 (Bankr.E.D.Pa.1984); *Anderson v. Automobile Fund*, 258 Pa.Super. 1, 391 A.2d 642 (1978); *Iron & Glass Bank v. Franz*, 9 Pa.D. & C.3d 419 (Allegheny 1978), and *Transnational Consumer Discount Co. of Erie v. Weaver*, 52 Erie Leg.J. 4 (C.P. Erie 1968). Whether such an analysis need be undertaken should follow a determination of whether some or all of the loan agreements must be rescinded.

I note that both the Pennsylvania usury and UDAP statutes condition the award of damages upon proof of actual harm. *See In re Russell*, 72 B.R. 855, 865 (Bankr.E.D. Pa.1987) ("... merely contracting with a consumer to obtain usurious interest does not ... [in Pennsylvania] result in [damages]"). Under Title 41, damages in the amount of the excessive interest or charges actually paid, or triple that amount, may be recovered. 41 P.S. § 502. *See In re Russell*, 72 B.R. at 865 ("it is only when 'excess interest' is 'paid' by the borrower or 'collected' by the lender that the treble-damage penalty of 41 P.S. § 502 is triggered"). *See also Larrimer v. Feeney*, 411 Pa. 604, 192 A.2d 351 (1963); *Trent Financial Corp. v. Church*, 12 Pa.D. & C.3d 451, 453 (Del.Co.1978); 4 Eisenberg, *Debtor–Creditor Law*, ¶ 16.03[D][2] (1989). Similarly, under the state UDAP act, the plaintiff must have suffered "ascertainable loss of money or property ..." in order to recover actual damages or $100.00, whichever is greater. 73 P.S. § 201–9.2. *Accord In re Bryant*, 103 B.R. 95 (Bankr.E.D.Pa.1989); *In re Clark*, 96 B.R. 569, 583 (Bankr.E.D. Pa.1989). As a general principle, the rescission of an agreement precludes an award of actual damages. *See Dollar Systems, Inc. v. Avcar Leasing System, Inc.*, 673 F.Supp. 1493, 1503 (C.D.Cal.1987), *rev'd in part on other gnds*, 890 F.2d 165

(9th Cir.1989); *Matter of Hummel*, 23 B.R. 8, 11 (Bankr.W.D.Mo.1982); 5A *Corbin on Contracts* § 1236 (1964 & Supp.1989). *See also* 19 *P.L.E.*, Interest and Usury § 24 (1959).

As will be discussed below, if the debtors have validly rescinded these four loan agreements under TILA, then all security agreements are voided, all liability for finance charges are eliminated, and each side is generally entitled to the return of the consideration given to the other. Therefore, if the debtors validly have elected to exercise their right to rescind, they cannot maintain that they have paid usurious finance charges, for they will have paid no finance charges at all. Similarly, if the debtors validly elected to rescind these loan agreements, they will have suffered no ascertainable UDAP damages from the initial or subsequent refinancings since, again, all duty to repay the complained of finance charges is extinguished and the mortgages cancelled.

■ Since the only actual damages alleged by the debtors all concern overcharges which would have occurred over the lives of these loans and the debtors have offered no evidence that a valid election on their part to rescind these loan transactions would not prevent such potential harm from actually occurring, then a conclusion that their recision election was permissible would render unnecessary any conclusions regarding their UDAP or usury claims. That is, a decision to rescind a loan transaction will generally prevent the borrower from demonstrating any actual injury which might flow directly or indirectly from the imposition of improper finance charges—the excessive cost of borrowing the funds—due to the relief provided by the recision.[2]

■ I appreciate that recently, in *In re Milbourne*, 108 B.R. 522, (Bankr.E.D.Pa. 1989), my colleague Judge Scholl reached a different conclusion and permitted a borrower both to rescind a loan transaction

under TILA and still receive actual UDAP damages based upon the lender's overcharges in connection with multiple refinancings. However, the decision does not discuss the tension between these remedies. I am also aware of decisions holding that a lender may be liable for statutory damages under TILA even if the loan is rescinded. *Gerasta v. Hibernia Nat'l Bank*, 575 F.2d 580 (5th Cir.1978); *Ljepava v. M.L.S.C. Properties, Inc.*, 511 F.2d 935 (9th Cir.1975). *Accord* 15 U.S.C. § 1640(g). Nonetheless, I find significant the distinction between statutory damages and actual damages when considering the effect of recision. *See Williams v. Public Finance Corp.*, 598 F.2d 349, 356 n. 11 (5th Cir.1979) (TILA statutory penalties, but possibly not actual damages, may be awarded even though a loan transaction is void under state law). *See also Dryden v. Lou Budke's Arrow Finance Co.*, 630 F.2d 641, 647 (8th Cir.1980) (the federal policy of awarding statutory damages as a penalty which is designed to compel compliance with TILA would be undermined by denying such a penalty when the lender permits recision of the loan). When the imposition of the recision remedy removes any potential harm to the borrower, and no actual harm prior to recision occurred, there can be no recovery for actual damages. One may nevertheless, for policy reasons designed to aid in compliance with TILA, still award the statutory penalty since it is largely unconnected with any actual harm to a particular borrower. *See Dryden v. Lou Budke's Arrow Finance Co.; Williams v. Public Finance Corp.*

Therefore, it is appropriate to focus first upon the TILA issues, for resolution of those issues may render unnecessary any treatment of the state law damage claims.

### III.

The Third Circuit Court of Appeals has, on a number of occasions, established the framework for interpreting TILA.

---

**2.** I qualify this statement because an injury could conceivably be caused by the recordation of an excessive or improper mortgage prior to recision which could, for example, prevent the borrower from consummating the sale of the property for a favorable price. There is no such evidence of injury in this proceeding.

The Truth-in-Lending Act was passed primarily to aid the unsophisticated consumer so that he would not be easily misled as to the total costs of financing.... Thus, the Act seeks "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various terms available to him and avoid the uninformed use of credit."

*Thomka v. A.Z. Chevrolet, Inc.*, 619 F.2d 246, 248 (3d Cir.1980) (*quoting* 15 U.S.C. § 1601(a)). *Accord Smith v. Fidelity Consumer Discount Co.*, 1989 WL 106695, 1989 U.S.App. Lexis 9103 (3d Cir.1989), *vacated in part, reconsideration pending*, 1989 WL 106695, 1989 U.S.App. Lexis 16273 (3d Cir.1989);[3] *Gennuso v. Commercial Bank & Trust Co.*, 566 F.2d 437 (3d Cir.1977).

■■■ Since the Act is a remedial statute designed to protect borrowers who are viewed as not on an equal footing with lenders, either in bargaining for credit terms or in knowledge of credit provisions, it "is to be liberally construed in favor of borrowers." *Smith*, slip op. at 4; *Bizier v. Globe Financial Services, Inc.*, 654 F.2d 1, 3 (1st Cir.1981). In order to accomplish its purposes, the Act and its accompanying regulation, 12 C.F.R. §§ 226.1 *et seq.* ("Regulation Z"),[4] mandate that certain aspects of the loan transaction be disclosed, and prescribe a format for such disclosure.[5] TILA is enforced by a system of "strict liability in favor of consumers." *Thomka*, 619 F.2d at 248. *Accord Smith*, slip op. at 4. The failure to properly disclose the required information may result in damages—both actual and statutory—if asserted within the one year statute of limitations. 15 U.S.C. § 1640(a), (e). Moreover, any violation of TILA, regardless of the technical nature of the violation, must result in a finding of liability against the lender. *Smith*, slip op. at 4 (quoting *Grant v. Imperial Motors*, 539 F.2d 506, 510 (5th Cir.1976)). Such a strict assessment of damages by courts was intended by Congress to create a "private attorney general" scheme of enforcement which would obviate the need for a large federal bureaucracy to perform such a task. *See Ives v. W.T. Grant Co.*, 522 F.2d 749 (2d Cir.1975). Even if the borrower can demonstrate no actual damages, statutory penalties are applied regardless of whether the borrower was misled or injured. *See Griggs v. Provident Consumer Discount Co.*, 680 F.2d 927, 932–33 (3d Cir.), *vacated on other gnds*, 459 U.S. 56, 103 S.Ct. 400, 74 L.Ed.2d 225 (1982). These statutory penalties provide a incentive for the private enforcement of TILA.[6] *Id.*

Of the required loan disclosures, some are viewed as "material." When a lender takes a security interest in the borrower's principal dwelling, the borrower is granted, by TILA, the statutory right to rescind the transaction. 15 U.S.C. § 1635(a).[7] This right expires either within three days from when the loan agreement is consummated or when all "material" disclosures are provided. *Id.* In no event may a borrower elect to rescind a loan transaction more than three years after the agreement was reached, even if all material disclosures have not been given. 15 U.S.C. § 1635(f). *Smith*, slip op. at 4. The definition of "material disclosures" has been provided by 15 U.S.C. § 1602(u) and Regulation Z, § 226.23(a)(3) n. 48. *See Smith*, slip op. at 7.

---

**3.** The portion of the opinion vacated by the Court of Appeals concerns its usury discussion and not its TILA analysis.

**4.** Unless the provisions of Regulation Z conflict with the terms of the statute itself, it should be "accepted by the courts." *Smith*, slip op. at 4. *See Anderson Bros. Ford v. Valencia*, 452 U.S. 205, 101 S.Ct. 2266, 68 L.Ed.2d 783 (1981).

**5.** To assist the lender, model disclosure forms have been made part of Regulation Z, Appendix G, H.

**6.** The rigors of TILA are mitigated somewhat by three statutory affirmative defenses which can be raised by a lender. 15 U.S.C. § 1640(b), (c), (f). *See Solis v. Fidelity Consumer Discount Co.*, 58 B.R. 983, 986–87 (E.D.Pa.1986). Here, Mid–Penn has not asserted any of these defenses and so they have not been considered in my resolution of this dispute.

**7.** Regulation Z, § 226.23(f) provides exceptions to this generalization.

Statutory penalties may befall the non-complying lender in a variety of ways. First, statutory damages of twice the finance charge, but not less than $100.00 and not greater than $1,000.00, shall be assessed against lenders who violate TILA. 15 U.S.C. § 1640(a)(2)(A). However, such a statutory damage may only be awarded when the borrower commences an action within one year of the date of the loan agreement. 15 U.S.C. § 1640(e). *See generally, e.g., Rudisell v. Fifth Third Bank,* 622 F.2d 243, 246 (6th Cir.1980). Second, if the one year limitations period has expired, then the borrower may raise the TILA violation by way of setoff or recoupment to the lender's claim. 15 U.S.C. § 1640(e). *See Werts v. Federal National Mortgage Assoc.,* 48 B.R. 980 (E.D.Pa.1985).[8] If this affirmative defense is proven, then the lender's claim shall be reduced by the appropriate statutory damages; however, the borrower may not achieve an affirmative recovery.

The statute now states that in loan transactions with multiple obligors, there can be only a single statutory penalty imposed. 15 U.S.C. § 1640(d). Also, TILA expressly limits statutory damages or recoupment recoveries to a single recovery when the lender has committed multiple TILA violations. 15 U.S.C. § 1640(g).

█ The last principle of TILA has been modified when the lender fails to rescind timely a loan transaction upon a proper request of the borrower. Courts have long held, and the Act now so states, 15 U.S.C. § 1640(a), that the failure of a lender to rescind a loan transaction, when the borrower has made a proper election, is an independent TILA violation which occurs at the time of the lender's refusal. *See, e.g., Harris v. Tower Loan of Mississippi, Inc.,* 609 F.2d 120, 123 (5th Cir.), *cert. denied,* 449 U.S. 826, 101 S.Ct. 89, 66 L.Ed.2d 30 (1980); *Reid v. Liberty Consumer Discount Co.,* 484 F.Supp. 435, 441 (E.D.Pa. 1980). Furthermore, courts have held (giv-

en the different limitations periods for damages due to the failure to disclose as distinct from the failure to rescind) that a borrower can obtain separate statutory damages due to the lender's failure to rescind and failure to disclose. *E.g., Aquino v. Public Finance Consumer Discount Co.,* 606 F.Supp. 504, 509–11 (E.D.Pa.1985). *Accord Smith v. Wells Fargo Credit Corp.,* 713 F.Supp. 354 (D.Ariz.1989); *Abele v. Mid–Penn Consumer Discount,* 77 B.R. 460, 469 n. 7 (E.D.Pa.1987), *aff'd without op.,* 845 F.2d 1009 (3d Cir.1988). Therefore, not only will such an improper refusal trigger statutory damages (in addition to the relief afforded the borrower under the recision provisions, 11 U.S.C. § 1640(g)), but the one year limitations period starts from the date of the recision request, not the date the loan agreement was entered. *Accord Harris v. Tower Loan of Mississippi, Inc.; Reid v. Liberty Consumer.* (This principle becomes relevant here as the debtors made their recision request in April 1988 and commenced this adversary proceeding in October 1988.)

### IV.

The only TILA issue I need reach is the first one raised by the debtors: whether Mid–Penn violated TILA by not including in the finance charge the debtors' purchase of fire insurance on their home. There is no dispute that the purchase of such insurance was a condition imposed by Mid–Penn when entering into the loan agreement in August 1985. Furthermore, there is no dispute that the cost of the insurance was $164.50. The record discloses that if the debtors did not have fire insurance at the time the loan agreement was to be consummated, Mid–Penn planned to place the fire insurance with an insurance agency known as Sidney Rosenfeld, Inc. *See* Ex. P–5 and P–10 (Deposition of Tench at 40).[9] It is uncontroverted that the cost of this insurance was added to the amount financed and not to the finance charge. Ex. P–1.

15 U.S.C. § 1605(c) requires: ,

---

**8.** Pennsylvania law does not bar TILA recoupments beyond the one year limitations period. *Household Consumer Discount Co. v. Vespaziani,* 490 Pa. 209, 415 A.2d 689 (1980).

**9.** The insurer was a Lloyd's of London underwriter. Ex. P–5.

(c) Charges or premiums for insurance, written in connection with any consumer credit transaction, against loss of or damage to property or against liability arising out of the ownership or use of property, shall be included in the finance charge unless a clear and specific statement in writing is furnished by the creditor to the person to whom the credit is extended, setting forth the cost of the insurance if obtained from or through the creditor, and stating that the person to whom the credit is extended may choose the person through which the insurance is to be obtained.

Regulation Z, § 226.4(b)(8) expressly states that the disclosed finance charge shall include "[p]remiums or other charges for insurance against loss of or damage to property, or against liability arising out of the ownership or use of property, written in connection with a credit transaction." An exception to this requirement is found in Regulation Z § 226.4(d)(2),[10] which states:

(2) Premiums for insurance against loss of or damage to property, or against liability arising out of the ownership or use of property, may be excluded from finance charge if the following conditions are met:

(i) The insurance coverage may be obtained from a person of the consumer's choice, and this fact is disclosed.

(ii) If the coverage is obtained from or through the creditor, the premium for the initial term of insurance coverage shall be disclosed. If the term of insurance is less than the term of the transaction, the term of insurance shall also be disclosed. The premium may be disclosed on a unit-cost basis only in open-end credit transactions, closed-end credit transactions by mail or telephone under § 226.17(g), and certain closed-end credit transactions involving an insurance plan that limits the total amount of indebtedness subject to coverage.

(footnotes omitted.)

■ In the first loan at issue, since the term of the homeowner's insurance policy was only one year, while the loan term was four years, and since the insurance was obtained through someone chosen by the lender, there were two disclosure requirements necessary in order for Mid–Penn to properly place the insurance charge in the amount financed: first, the borrowers were to be informed that the insurance could be obtained by anyone of their choosing; and the term of the insurance policy was to have been disclosed.[11] *See, e.g., Reneau v. Mossy Motors; Harris v. Tower Loan of Mississippi, Inc.*

■ Here, neither disclosure was made. Exhibit P–1, which includes the disclosure statement given to the debtors in connection with the August 21, 1985 loan, makes no mention of the property insurance except to list it among the items included in the amount financed,[12] let alone disclose the two matters mentioned above. Such omissions mean that the cost of the insurance should have been included in the finance charge and not the amount financed. *See Reneau v. Mossy Motors; Harris v. Tower Loan of Mississippi, Inc.; Davis v. United Companies Mortg. & Invest. of Gretna, Inc.,* 551 F.2d 971 (5th Cir.1977); *Burton v. G.A.C. Finance Co.,* 525 F.2d 961 (5th Cir.1976); *Brown v. National Permanent Federal Sav. & Loan Assoc.,* 526 F.Supp. 815 (D.D.C.1981), *aff'd in perti-*

---

**10.** The origin of the current statutory provision at § 1605(c) is former § 1605(c) of the repealed TILA, and the origin of the current regulatory provisions, Regulation Z § 226.4(b)(8), (d)(2), are former regulations 12 C.F.R. §§ 224.4(a)(6) and 226.402. *See Reneau v. Mossy Motors,* 622 F.2d 192, 194 (5th Cir.1980). As the import of those former provisions has remained unchanged by current TILA and Regulation Z, decisions interpreting those former sections are relevant to this proceeding.

**11.** To assist lenders in properly disclosing this information, the Federal Reserve Board has prepared model disclosure forms, which are part of Regulation Z. Form H–1 contains an acceptable method of disclosing that property insurance is available from sources other than the lender.

**12.** There is a notation of payment on the borrowers' behalf to "Sidney Rosenfeld" in the amount of $164.50. There is no dispute that this payment represents the premium for property insurance for one year.

*nent part,* 683 F:2d 444 (D.C.Cir.1982); *Reid v. Liberty Consumer Discount Co.; Vines v. Hodges,* 422 F.Supp. 1292 (D.D.C. 1976).

Not only does this error result in an improper disclosure of the amount financed and finance charge (both of which must be correctly disclosed under 15 U.S.C. § 1638(a)(2), (3)) but it also caused Mid–Penn to understate the true annual percentage rate, also a required disclosure item (15 U.S.C. § 1638(a)(4)).[13]

■ In its posttrial memorandum, Mid–Penn argues that the debtors were informed orally that they could purchase insurance from any source and need not go through the lender. However, there was no evidence at trial to support this position;[14] furthermore, all disclosures are to be made in writing. 12 C.F.R. § 226.17(a).[15] Thus, an oral statement would not meet federal standards.[16]

■ On the three later loan transactions between these parties, no loan funds were expended for property insurance. The debtors argue nonetheless that maintenance of insurance was a precondition to these subsequent loans and so the cost of such insurance should again be included in the finance charge. To support its contention, it notes that when the property insurance lapsed, Mid–Penn and the debtors were given notice, and that Mid–Penn renewed the policy at a premium cost of $175.68, Ex. P–5, and added this sum to the principal amount of the loan then outstanding. Ex. P–12. Nevertheless, I agree with Mid–Penn that TILA imposes no obligation to include this insurance cost as a finance charge.

As the Third Circuit Court of Appeals recently explained, not all loan preconditions, even if they involve a cost to the borrower, are necessarily finance charges. *Smith,* slip op. at 25. The regulation here refers to premiums or other charges for property insurance "written in connection with a credit transaction." 12 C.F.R. § 226.4(b)(8). The fact that such insurance is a loan condition does not render it a finance charge when no loan proceeds are expended to purchase the insurance. *Boncyk v. Cavanaugh Motors,* 673 F.2d 256, 260–61 (9th Cir.1981). *See Kramer v. Marine Midland Bank,* 559 F.Supp. 273, 287–88 (S.D.N.Y.1983).

This conclusion is unaffected by the debtors' later failure to maintain such insurance and Mid–Penn's subsequent premium payment. Even though this later premium was added to the loan amount, the Official Staff Commentary to Regulation Z clearly states, at § 226.17(e)1:

1. *Events causing inaccuracies.* Inaccuracies in disclosures are not violations if attributable to events occurring after the disclosures are made. *For example, when the consumer fails to fulfill a prior commitment to keep the collateral insured and the creditor then provides the coverage and charges the consumer for it, such a change does not make the original disclosures inaccurate.* The creditor may, however, be required to make new disclosures under sections 226.17(f) or 226.19 if the events

---

**13.** In Appendix A, I have detailed the actual disclosures and compared them with those that should have been given. I note here that the error in properly classifying the property insurance premium resulted in the APR being understated in August 1985 by roughly 3% (27.58% versus 30.70%).

**14.** The lender attempts to attach to its posttrial memorandum an affidavit of a Mid–Penn employee to this affect; this affidavit was not reviewed and may not be considered since it provides the debtors with no opportunity for cross-examination or rebuttal.

**15.** 12 C.F.R. § 226.17 n. 38, when read in conjunction with § 226.18(n), allows the written

disclosures set out in § 226.4(d)(2) to be made separately from other disclosed information. Nevertheless, Mid–Penn has offered no evidence of record that any document provided to the debtors at the time they entered into this loan transaction disclosed the information required by § 226.4(d)(2).

**16.** The Official Staff Commentary ("OSC") to Regulation Z repeats the obligation to make the disclosures required by 12 C.F.R. § 226.4(d) in writing. OSC § 226.4(d)1 ("The required disclosures must be made in writing...."). It also echoes Regulation Z in explaining the disclosures needed. *See* OSC § 226.4(d)8 (discussing property insurance).

occurred between disclosure and consummation or under section 226.20 if the events occurred after consummation.

(emphasis added.)

 Unfortunately for Mid–Penn, my conclusion that the property insurance premium should have been included in the finance charge for the first loan only does not insulate the subsequent loans from related TILA misdisclosures. This follows from the manner in which Mid–Penn chose to structure the loans.

By structuring each later loan so that its proceeds were used in part to repay the prior outstanding loan, (rather than treating the later loans as separate and distinct), Mid–Penn "refinanced" the earlier loans, Regulation Z, § 226.20, and was required by state law to rebate unearned interest charges when calculating the payoff figure for the prior loan.[17] 7 P.S. § 6214 D. *See* Regulation Z, 12 C.F.R. § 226.20(a); *In re Jones*, 79 B.R. 233, 236–38 (Bankr.E.D.Pa. 1987), *rev'd in part on other gnds*, 93 B.R. 66 (E.D.Pa.1988). Mid–Penn did so rebate, in proper mathematical fashion, under the Rule of 78's.[18] However, because the initial finance charge was erroneously understated due to its omission of the cost of the property insurance, Mid–Penn miscalculated the rebate due and understated in all subsequent loans the dollar amount of rebate to which the debtors were entitled. Since the rebate calculation was used by the defendant to compute the amount the debtors needed to borrow in order to refinance, as well as other material loan terms, by using this refinancing method Mid–Penn

has carried forward its error in calculating the correct finance charge for each subsequent loan and retained a portion of the old unearned finance charge. (See Appendix A.)

 Any retention of an unearned portion of a finance charge must be considered part of the finance charge of the refinanced loan. Regulation Z, § 226.20(a). *Accord Steele v. Ford Motor Credit Co.*, 783 F.2d 1016, 1017 (11th Cir.1986). Appendix A to this memorandum opinion demonstrates that Mid–Penn's failure to correctly rebate the unearned portion of the earlier finance charge (because it understated the amount of that charge) resulted in its understating the true finance charge and annual percentage rate [19] (and overstating the true amount financed) in loans two through four. Therefore, for each of the loan transactions, Mid–Penn failed to accurately disclose the correct finance charge, annual percentage and amount financed. *See Steele v. Ford Motor Credit Co.* These are "material" misdisclosures, 12 C.F.R. § 226.23(a)(3) n. 48, *accord Smith*, which extended the debtors' rescission rights three years. *See Steele v. Ford Motor Credit Co.* Moreover, loans two through four, even though refinancings, involved the borrowing of additional funds by the debtor, thus rendering them non-exempt transactions for rescission purposes. 12 C.F.R. § 226.23(f)(2). As the debtors validly notified Mid–Penn of their election to rescind all four of the transactions, Mid–Penn wrongfully refused to honor that election.[20] *See also*, 12 C.F.R.

---

**17.** In *Milbourne,* the bankruptcy court explains that the method of computing the unearned finance charge in Pennsylvania, called the Rule of 78's (compared with the actuarial method), may be favorable to the lender. That does not, as the debtors suggest, make the use of this computational method improper under TILA. *See Nichols v. Mid–Penn Consumer Discount Co.,* 1989 WL 46682, 1989 U.S.Dist. Lexis 4796 (E.D. Pa.1989), *aff'd without op.,* 891 F.2d 282 (3d Cir.1989).

**18.** By this I mean only that the defendant used the correct rebate percentage under the Rule of 78's. As will be discussed, it applied this percentage to the wrong finance charge amount, which thus yielded the wrong dollar rebate.

**19.** This understatement was by more than the tolerance of 0.125% permitted by TILA in § 1606(c) for the APR, and by more than the finance charge tolerances set in Regulation Z, § 226.18(d) n. 41.

**20.** Since the debtors are capable of electing to rescind all of their loan transactions with Mid–Penn, because all occurred within three years of the notice to rescind, and material misdisclosures were made in each of the loans, I need not decide what would occur if only the later loans—that is, those which refinanced an earlier loan—could be rescinded. Whether rescission of the refinancing loan eliminates all finance charges and outstanding security interests—at least if, as occurred here, a "new loan" form

§ 226.17(c)(1) ("disclosures shall reflect the terms of the legal obligation between the parties."); *Gallegos v. Stokes,* 593 F.2d 372, 374 (10th Cir.1979) (disclosing a finance charge greater than legally permitted by state law violates TILA).

■ The consequences of these conclusions are as follows. First, the debtors are entitled to have all the finance charges on all of the loans eliminated and the outstanding mortgage (or mortgages) cancelled. Second, as to loans one through three, the unsecured claim of Mid–Penn shall be reduced, in the nature of recoupment, by $1,000.00 per loan. The TILA

violation on the fourth loan was asserted within the one year limitation period and so results in a statutory penalty of $1,000.00. The failure to rescind the four loan transactions yields statutory damages of $1,000.00 per loan.[21] *Abele v. Mid–Penn Consumer Discount; In re Milbourne.*[22]

To determine the creditor's unsecured claim without finance charges I have added all sums disbursed in connection with the four loans (but not including the first property insurance premium which was paid out of loan funds) and reached the total of $5,263.59. Against this sum must be credited the total amount repaid by the debtors

notice of rescission, Regulation Z, App. H–8, as compared with a refinancing loan Regulation Z App. H–9 form rescission notice, is given to the borrower—as *In re Tucker,* 74 B.R. 923 (Bankr. E.D.Pa.1987) so held, or whether 12 C.F.R. § 226.23(f)(2) would limit the effect of rescission to the finance charge and security interest related to the new value given to the borrower, I need not resolve.

In addition, Mid–Penn does not argue, and so I do not fully address, whether a borrower validly may rescind a loan transaction that has been refinanced. While the decision of *King v. California,* 784 F.2d 910, 913 (9th Cir.1986), *cert. denied,* 484 U.S. 802, 108 S.Ct. 47, 98 L.Ed.2d 11 (1987) suggests, in a conclusory manner, that the borrower may not, a number of other decisions hold that the borrower may do so, so long as he could obtain relief by recovering funds paid or elininating finance charges. *E.g., Nichols v. Mid–Penn Consumer Discount Co.; Abele v. Mid–Penn Consumer Disc. Co.,* Here, such relief could be obtained by the debtors.

This question should be answered with some reference to Regulation Z, § 226.23(f)(2). Since this regulatory subsection limits the effect of rescission of the refinanced transaction (not the prior transaction), to elimination of the finance charges and security interest only as to the new value provided to the borrower it implies that the borrower may also rescind the prior transaction if such election is made timely and there is just cause to so rescind. Indeed, given that TILA is to be favorably construed toward borrowers, and that provisions such as 15 U.S.C. § 1635(d) and 12 C.F.R. § 226.23(e) limit a borrower's ability to waive his rescission rights, the loss of a borrower's ability to rescind a loan transaction that has later been refinanced, due solely to refinancing, is questionable.

21. The debtors assume, correctly, that they are entitled to statutory penalties for the failure of Mid–Penn to rescind the second, third and fourth refinancing loans, recoupment recoveries for the second and third loans, and statutory penalties for loan number four, at twice the

finance charge which should have been disclosed, with a $1,000.00 ceiling. Courts have routinely held that refinancings are separate transactions which may yield separate statutory penalties. *E.g., In re Scaife,* 825 F.2d 357 (11th Cir.1987); *Brown v. Marquette Sav. & Loan Assoc.,* 686 F.2d 608 (7th Cir.1982); *Gill v. Mid–Penn Consumer Discount Co.,* 671 F.Supp. 1021 (E.D.Pa.1987), *aff'd without op.,* 853 F.2d 917 (3d Cir.1988); *Bookhart v. Mid–Penn Consumer Discount Co.,* 559 F.Supp. 208 (E.D.Pa.1983); *Wise Furniture v. Dehning,* 343 N.W.2d 26 (Minn.1984). *Accord* Rohner, *The Law of Truth-in-Lending* ¶ 12.04[2][a] (1984). Courts have also held that the statutory penalty imposed for misdisclosures connected to such refinancings is a multiple of the total finance charge for that transaction (with the statutory ceiling), and not just related to the finance charge incurred by the new value provided to the borrowers. *Id.*

22. The debtors contend in their posttrial memoranda that the cost of the property insurance should be treated as actual damages because it was improperly treated as a finance charge. (This argument would apply only to the property premium on the first loan as I have concluded that there was no need to disclose the premiums connected with the later loans.) I appreciate that the effect of recision is to cancel finance charges. Nonetheless, that does not mean that the debtors suffered any harm, or that the record discloses any harm, by their purchase of such insurance. Indeed, none of the decisions holding that property insurance was misclassified in the TILA disclosure statement awarded actual damages, as opposed to statutory damages, to the borrower. Therefore, the cost of the property insurance will not be added to the debtors' affirmative damage claim against the defendant; nor will that cost, insofar as it should have been classified as a finance charge, be considered when computing the defendant's allowed unsecured claim.

on the four loans, $4,364.00.[23] The difference, $899.59, is subject to the recoupment reduction of $3,000.00, which eliminates the unsecured claim entirely.

In conclusion, the proof of claim of Mid–Penn is disallowed. Mid–Penn will be directed to cancel any outstanding mortgages. Judgment will be entered in favor of the debtors in the sum of $5,000.00;[24] debtors' counsel will be provided an opportunity to request appropriate attorneys fees.

## APPENDIX A

### (1) Loan of August 21, 1985

| | | FC[1] | AF[2] | APR[3] | PMT[4] | PMT/MON | REBATE[5] |
|---|---|---|---|---|---|---|---|
| (a) | Disclosures given to debtors | $2,197.60 | $3,322.40 | 27.58% | 48 | $115 | 63.0102% $1,321.70 |
| (b) | Disclosures corrected when $164.50 property insurance part of FC and not AF | $2,362.10 | $3,157.90 | 30.70% | 48 | $115 | 63.0102% $1,425.35 |

### (2) Loan of May 23, 1986

| | | FC | AF | APR | PMT | PMT/MON | REBATE |
|---|---|---|---|---|---|---|---|
| (a) | Disclosures given to debtors | $2,872.48 | $4,423.52 | 27.14% | 48 | $152 | 69.7279% $1,933.19 |
| (b) | Disclosures corrected for miscalculating rebate | $2,976.13 | $4,319.87 | 28.58% | 48 | $152 | 69.7279% $2,005.47 |

### (3) Loan of January 14, 1987

| | | FC | AF | APR | PMT | PMT/MON | REBATE |
|---|---|---|---|---|---|---|---|
| (a) | Disclosures given to debtors | $3.200.80 | $4,959.20 | 27.00% | 48 | $170 | 50.5952% $1,568.86 |
| (b) | Disclosures corrected for miscalculating rebate | $3,273.80 | $4,886.92 | 27.89% | 48 | $170 | 50.5952% $1,605.43 |

### (4) Loan of February 22, 1988

| | | FC | AF | APR | PMT | PMT/MON | REBATE |
|---|---|---|---|---|---|---|---|
| (a) | Disclosures given to debtors | $3,200.80 | $4,959.20 | 27.00% | 48 | $170 | N/A |
| (b) | Disclosures corrected for miscalculating rebate | $3,237.37 | $4,922.63 | 27.44% | 48 | $170 | N/A |

1. FC = Finance Charge
2. AF = Amount Financed
3. APR = Annual percentage rate
4. PMT = Payments due
5. Rebate = Rule of 78's rebate percentage, when the loan was later refinanced, for unearned finance charges.
 Every loan transaction had a non-refundable $100 portion of the FC which was excluded from the rebate.

**23.** This dispute does not warrant a determination that Mid–Penn must forfeit all sums received by the debtors. 15 U.S.C. § 1635(b). *Accord, e.g., Harris v. Tower Loan of Mississippi, Inc.,* 609 F.2d at 123; *In re Milbourne,* 108 B.R. at 533.

**24.** As this is a chapter 13 bankruptcy case and as 11 U.S.C. § 1306(b) directs that chapter 13 debtors are entitled to possession of estate property except as provided by confirmation of a plan, there is no basis to have the judgment be paid out to the chapter 13 trustee. *But see In re Tucker,* 74 B.R. 923, 933 (Bankr.E.D.Pa.1987).