In re Kenya ARMSTRONG, Debtor.

Kenya Armstrong, Plaintiff,

v.

Nationwide Mortgage Plan/Trust, Mego Mortgage Corp, and Classic Exteriors, Inc., Defendants.

Bankruptcy No. 00–16579 SR.
Adversary No. 01–014.

United States Bankruptcy Court,
E.D. Pennsylvania.

Jan. 24, 2003.

Marian C. Nowell, Philadelphia, PA, for debtor.

Judith T. Romano, Philadelphia, PA, for creditor.

## OPINION

STEPHEN RASLAVICH, Bankruptcy Judge.

### Introduction

The Debtor has filed a multi-count Complaint alleging violations of State and Federal consumer lending law. Among the Defendants, only Nationwide has defended. A trial on this matter was held on September 19, 2002. For the reasons set forth in the following Opinion, judgment will be entered in favor of Debtor consistent with the terms of the attached Order.[1]

### Background

The Debtor has filed suit against Classic Exteriors, Inc. (Classic), Mego Mortgage Corp. (Mego), and Nationwide Mortgage Plan/Trust (Nationwide) arising out of a home improvement contract. It is alleged that all of the Defendants violated the Truth in Lending Act[2] (TILA), the Equal Credit Opportunity Act[3] (ECOA), and Pennsylvania Consumer Protection law[4] (UDAP). Classic alone is alleged to have breach its duty to perform under Pennsylvania contract law. A fifth count is directed to all defendants alleging unconscionability and a sixth to Nationwide seeking avoidance of its security interest under the Trustee's strong arm powers.[5]

Classic and Mego have not responded to the Complaint and are in default. Nationwide opposes the Complaint claiming that as an assignee of the contract, it is not

---

1. Because the Complaint seeks to avoid a secured interest in the Debtor's property, it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(K). That subparagraph includes among core proceedings "determinations of the validity, extent, or priority of liens."

2. 15 U.S.C. § 1601 et seq.

3. 15 U.S.C. § 1691 et seq.

4. 73 P.S. § 201–1 et seq.

5. 11 U.S.C. § 544(a).

liable for the violations committed by the other defendants. Trial was held on September 19, 2002. The parties were given the opportunity to brief the issues. The Debtor submitted a brief and Nationwide offered proposed findings of fact and conclusions of law. The matter was then taken under advisement.

*Facts:*

Classic, a home improvement contractor, solicited Debtor at her house offering repairs and improvements. N.T. 34. Debtor and Classic signed a contract on July 24, 1997 for improvements to her kitchen and bathroom. N.T. 35; *see* J1–a. The cost of the work was $24,795.00 all of which would be financed through Classic. N.T. 36.

About one week later, Classic returned to Debtor's house "with documents for her to sign." N.T. 36. Among those documents was a Home Improvement Contract (*See* J2–a), two Notices of Intent to Cancel (*See* J4a–1 and 2), and a Mortgage (*See* J3). It is these documents which concern the Court chiefly. The Home Improvement Contract [6] was represented to Debtor to have been "approved by the loan people for [Debtor] to get the money for [Classic] to do work on [Debtor's home]." N.T. 37. That contract contains payment terms which vary from those terms contained in the contract which she signed on July 24, 1997. *See* J2–a. Under this contract, the number of monthly payments would increase by 60. *Id.*

Debtor also received at Classic's second visit two documents entitled "Notice of Right to Cancel." [7] Both notices recite the following verbatim:

Your are entering into a transaction that will result in (mortgage/lien/security interest) (on/in) your home. You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last

(1) the date of the transaction, which is _____; or

(2) the Date you received your Truth in Lending disclosures; or

(3) the date you received this notice of your right to cancel.

. . .

If you cancel by mail or telegram, you must send the notice no later than midnight of _____, 19 __ (or midnight of the third business day following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be DELIVERED to the above address no later than that time.

*See* J4a–1 and J4a–2.

Finally, the Debtor granted Classic a mortgage on her home as collateral. *See* J3–a. Her copy of the mortgage does not appear to bear a notary seal even though the copy produced by Nationwide does. Significantly, the Debtor recalls that no notary was present at the July 30 closing at her home; only the Debtor and Classic's representative attended. N.T. 38–40.

The day after Classic's second visit, Debtor called Classic to rescind the loan. N.T. 42. She explained that she would not be able to afford the loan because she had become unemployed due to a knee injury

---

**6.** For convenience purposes, that contract will be hereafter referred to as the 7/30/97 Contract. That designation is derived from Nationwide's copy of the contract which has that date on it; Debtor's copy is undated. *See* J–2b

**7.** One of the notices bears the designation "Federal Law" at the top left hand corner (*see* J4–a(1)) while the other bears the abbreviation "PA" for Pennsylvania. *See* J4a(2). They are otherwise identical.

and complications of pregnancy. *Id.* But Classic refused, claiming that the deadline for her to rescind had passed. N.T. 43. Debtor apparently accepted this explanation and the work on her house proceeded. *Id.*

Upon completion, the work appeared, superficially at least, to have been done well. *Id.* But it was only after the improvements were tested that the true quality of the work became evident. Debtor reported that the new toilet flooded; that the dishwasher did not function; and that the roof repairs, instead of channeling rain away from the sides of the house, collected it above the kitchen window where it seeped inside. N.T. 44. To make matters worse, Classic's attempts to remedy its defective work served only to cause more problems. *Id.* Thereafter, Debtor stopped paying on the loan. N.T. 45.

Debtor's refusal to pay caused Nationwide[8] to begin foreclosure in September 1999. *See* J8, J13. Debtor sent a written rescission demand to Nationwide. The basis for the rescission was alleged to be Truth in Lending violations. Nationwide refused the Debtor's demand. The Debtor next filed this bankruptcy and Nationwide filed a secured proof of claim. This Adversary Proceeding followed.

*Analysis*

*Count I–TILA*

This count alleges violations of §§ 1635 and 1638 of TILA. The Debtor maintains that she was not given notice of her right to rescind the contract (§ 1635) nor disclosure of the payment terms of the loan (§ 1638). In that regard, TILA provides:

**(a) Disclosure of obligor's right to rescind**

Except as otherwise provided in this section, in the case of any *consumer credit transaction* (including opening or increasing the credit limit for an open end credit plan) in which a *security interest,* including any such interest arising by operation of law, is or will be *retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended,* the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction *after delivery of the information and rescission forms* required under this section together with a statement containing the material disclosure required under this subchapter, which ever is later, by notifying the creditor, in accordance with the regulation of the Board, of his intention to do so. *The creditor shall clearly and conspicuously disclose,* in accordance with regulations of the Board, to any obligor in a transaction subject to this section the rights of the obligor under this section. The *creditor* shall also provide, in accordance with regulations of the Board, appropriate forms for the obligor to exercise his right to rescind any transaction subject to this section.

and

**(a) Required disclosures by creditor**

For each *consumer credit transaction* other than under an open end credit plan, the *creditor* shall disclose each of the following items, to the extent applicable:

. . .

8. By this time, the holder of the contract was Nationwide who had purchased the loan from Mego (*see* Exhibit J3c) who previously had purchased it from Classic on September 5, 1997 (*See* Ex. J2–b, second side).

(6) The *number, amount and due dates* or period *of payments* scheduled to repay the total of payments.

15 U.S.C. §§ 1635(a), 1638(a)(6) (emphasis added).

Emphasis in the above citations in required because the parties are unable to agree that the loan is covered by TILA. *Compare* PreTrial Statements. The Court's analysis must start with the basic elements of a TILA transaction. From there, it works upwards to the substantive TILA claims.

*Is the Home Improvement Installment Contract a "Consumer Credit Transaction"?*

█ Both §§ 1635 and 1638 speak of "consumer credit transactions." There is no one single definition for that term; instead, it is defined in parts. "Consumer" is defined as follows:

(h) The adjective "consumer", used with reference to a credit transaction, characterizes the transaction as one in which the party to whom credit is offered or extended is a *natural person,* and the money, property, or services which are the subject of the transaction are primarily for *personal, family, or household purposes.*

15 U.S.C. § 1602(h)

There would appear then to be two elements to "consumer." First, the consumer must be a natural person. That is alleged, and admitted, at ¶ 4 of the Complaint. *See* Complaint, ¶ 4. Second, the subject of the credit transaction must primarily be for personal, family or household use. The Home Improvement Contract indicates that the financing would pay for home improvements. *See* Ex. P–2a.

Having determined that the Debtor is a consumer, we next analyze whether the financing constitutes a "credit transaction." The term "credit" is simply defined as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(e). The Home Improvement Installment Contract plainly indicates that the loan will be paid over time. *See* Ex. P–2a. It would appear beyond doubt that this loan is a consumer credit transaction as defined by TILA.[9]

*Is Nationwide a Creditor as Defined by TILA?*

Having determined that the loan is a consumer credit transaction, we proceed to the next element mutual to both TILA sections: that a "creditor" extended the financing. A "creditor" is defined as:

a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement.

15 U.S.C. § 1602(f)

The Debtor alleges (implicitly) that Nationwide is a "creditor" as defined by TILA. *See* Complaint, ¶ 40. This is admitted by Nationwide. The Court concludes that the loan is covered under TILA, and will analyze the substantive claims.

9. Leaving nothing to chance, the Debtor alleges (and Nationwide admits) that the loan was not used to purchase the mortgaged property. *See* Complaint, ¶ 43. She is referring to the exemption from § 1635 for residential mortgage transactions. *See* 15 U.S.C. § 1635(e)(1).

*Was the Debtor Given Notice of Her Right to Rescind?*

■ The Debtor alleges that she was not given notice of her right to rescind the transaction. *See* Complaint ¶ 44. Again, § 1635 provides, in pertinent part:

[T]he creditor shall clearly and conspicuously disclose, in accordance with regulations of the Board, to any obligor in a transaction subject to this section the rights of the obligor under this section. The creditor shall also provide, in accordance with regulations of the Board, appropriate forms for the obligor to exercise his right to rescind any transaction subject to this section.

15 U.S.C. § 1635(a).

Regulation Z, the interpretive regulation for TILA, requires the following with regard to a debtor's right to rescind:

(b)(1) Notice of right to rescind. In a transaction subject to rescission, a creditor shall deliver two copies of the notice of the right to rescind to each consumer entitled to rescind (one copy to each if the notice is delivered by electronic communication as provided in § 226.36(b)). The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:

(i) The retention or acquisition of a security interest in the consumer's principal dwelling.

(ii) The consumer's right to rescind the transaction.

(iii) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.

(iv) The effects of rescission, as described in paragraph (d) of this section.

(v) The date the rescission period expires.

12 C.F.R. § 226.23(b)(1) (emphasis added)

As proof, Debtor offers the Notices of Right to Cancel both of which are blank as to when that deadline begins to run. *See* Ex. J–4a1 and J–4a2. Nationwide does not dispute that the Debtor's copies of the forms are blank where indicated; instead, it maintains that the copies it received in taking the assignment were filled in where required. This position is both a tacit admission that Debtor's rescission rights were not disclosed to her and an implicit assertion of an affirmative defense: that it is a transferee who took the loan in good faith. That defense will be analyzed *infra.*

*Is the Failure to Fully Complete the Notice of Right to Cancel a Violation of TILA?*

■ TILA and Regulation Z contain detailed disclosure requirements for consumer loans. Technical or minor violations of TILA or Regulation Z, as well as major violations, impose liability on the creditor and entitle the borrower to rescind. "To insure that the consumer is protected ... [TILA and Reg Z must] be absolutely complied with and strictly enforced." *Mars v. Spartanburg Chrysler Plymouth, Inc.,* 713 F.2d 65, 67 (4th Cir. 1983) (holding that technical violation, even if merely a "minor variation in language and type size" from TILA requirements, imposes liability); *see also Huff v. Stewart–Gwinn Furniture Co.,* 713 F.2d 67, 69 (4th Cir.1983) (minor violations of TILA and Reg Z impose liability even if, as creditor alleged, consumer "was not misled and was given a meaningful and correct disclosure of crucial credit terms").

Regulation Z "makes clear that failure to fill in the expiration date of the rescission form is a violation of the TILA." *Semar v. Platte Valley Fed. S & L,* 791 F.2d 699, 704 (9th Cir.1986) *citing Wil-*

*liamson v. Lafferty,* 698 F.2d 767, 768–69 (5th Cir.1983). *Williamson* held that the omission of the expiration date, though a purely technical violation of TILA, entitled the plaintiff to rescind the loan agreement for up to three years, without regard to whether the omission was material. *Id.* at 768; *see also Aquino v. Public Finance Consumer Discount Co.,* 606 F.Supp. 504, 507 (E.D.Pa.1985) (omission of expiration date of rescission right gives borrower right to rescind loan); *Mayfield v. Vanguard S & L Ass'n,* 710 F.Supp. 143, 146 (E.D.Pa.1989) (holding that failure to specify such dates automatically violates TILA and entitles plaintiff to rescind the loan within the three year rescission period).

■ Both Notices of Right to Cancel produced by the Debtor lack the date of the transaction and the corollary deadline to rescind. This is a clear violation of § 1635. This gave the Debtor 3 years from the date of the loan closing to rescind. *See* 15 U.S.C. § 1635(f). She did so in her counsel's 11/17/99 letter. *See* Ex. J14.

*Was the Debtor Not Provided With the Proper Disclosure of the Repayment Schedule?*

■ Debtor next alleges a violation of TILA § 1638. Specifically, she alleges that the lender failed to disclose "the number, amount and due dates or period of payments scheduled to repay the total of payments." 15 U.S.C. § 1638(a)(6). But unlike the § 1635 violation, this is not a case of *no* information but one of *mis* information. Debtor maintains that the lender presented to her two different contracts with inconsistent payment terms. This inconsistency, she concludes, fails to meet the "clear and conspicuous" standard for such disclosures. *See* 15 U.S.C. § 1632(a).

Informing consumers of the true cost of credit has been recognized by the courts in this Circuit as the fundamental purpose of the TILA:

"The Truth in Lending Act was passed primarily to aid the unsophisticated consumer so that he would not be easily misled as to the total costs of financing... Thus, the Act seeks 'to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various terms available to him and avoid the uninformed use of credit.'" 15 U.S.C. § 1601. *In re Ralls,* 230 B.R. 508, 515 (Bankr.E.D.Pa.1999) *citing Thomka v. A.Z. Chevrolet, Inc.,* 619 F.2d 246, 248 (3d Cir.1980).

*See also, Smith v. Fidelity Consumer Discount Co.,* 898 F.2d 896, 898 (3d Cir.1990), *aff'd in part & superseded in part,* 898 F.2d 907 (3d Cir.1990); *In re Woolaghan,* 140 B.R. 377, 382 (Bankr.W.D.Pa.1992); *In re Steinbrecher,* 110 B.R. 155, 160–161 (Bankr.E.D.Pa.1990); *and In re Perry,* 59 B.R. 947, 948–949 (Bankr.E.D.Pa.1986).

To accomplish its purpose, the TILA and its implementing Regulation Z require lenders to disclose to consumers certain material terms clearly and conspicuously in writing, in a form that the consumer may examine and retain for reference. *See* 15 U.S.C. 1638(b)(1); 12 C.F.R. § 226.17(a)(1); and *Wright v. Mid–Penn Consumer Discount Co.,* 133 B.R. 704, 707–08 (E.D.Pa.1991). *See also Nichols v. Mid–Penn Consumer Discount Co.,* 1989 WL 46682 at *4 (E.D.Pa. Apr.28, 1989) ("[T]he TILA and Reg. Z ... guarantee ... meaningful disclosure of credit terms by requiring the creditor to give the borrower a Disclosure Statement specifying the credit terms in clear and straightforward language.") The material terms that must be disclosed to create liability include the amount financed, the finance charge,

the annual percentage rate, *the payment schedule,* and the total of payments, and are referenced in 15 U.S.C. §§ 1602(u) and 1638(a). *See In re Ralls,* 230 B.R. at 515 (emphasis added).

But that did not happen here. The Contract dated 7/24/97 provides the following with regard to commencement and repayment of the loan:

> Contractor agrees to start above described work approximately 8/24/97 and complete described work approximately 9/24/97
>
> Cash price of job: $24,795.00 Down Payment: $0 Balance: $24,795.00
>
> All of the above work payable at $325 per month for 180 months. First payment is to be made 30 days after completion of said work.

*See* Ex. J–1a

Compare this to the repayment terms as stated in the 7/30/97 Contract:

SCHEDULE OF PAYMENTS

| No. of Payments | Amount of Payments | Payments are due monthly on the same date each month beginning one month from the date this Contract is purchased from Seller |
| --- | --- | --- |
| 240 | $326.31 | September 15, 1997 |

*See* Ex. J–2a.

On the face of the documents, there are three discrepancies. First, and the smallest of the three, is the quoted monthly payment amount. The 7/24/97 Contract states that the monthly payment will be $325 while the 7/30/97 Contract states the that payment will be $326.31. Second, and more serious, is the difference in the number of monthly payments. The 7/24/97 Contract states that 180 monthly payments are required while the 7/30/97 Contract states 240 must be made. This is a difference of 60 payments. At $326.31 per month, this means that the Debtor must

make another $19,578.00 in payments. And finally, the two Contracts recite substantially different dates for the date of the first payment. The 7/24/97 Contract states that the first payment must be made 30 days after completion of the home improvements, or approximately 10/24/97. This is in contrast to the 7/30/97 Contract, which estimates the first payment to be due 9/15/95. *See* Ex. J2a. This is a difference of almost six weeks. Considering the gross discrepancies between the two Contracts regarding the number of payments and the date the first payment is to be made, the Court concludes that there is a failure to clearly and conspicuously disclose material terms of this loan.

*Nationwide's Defense that it is an Assignee*

■ Nationwide does not dispute Debtor's claim that its Notices of Right to Cancel (Ex. J4a1 and 2) *were not* properly filled out or that the two contracts contain conflicting terms. Instead, it asserts that the copies of Notices of Right to Cancel in its possession *were* filled out and that the loan documents were otherwise in order. N.T. 66–67. There being no apparent defect in those loan disclosures, Nationwide concludes it may raise the affirmative defense of a good faith transferee. N.T. 4.

Nationwide relies in this regard on TILA § 1641(e) which states:

> Except as otherwise specifically provided in this subchapter, any civil action against a creditor for a violation of this subchapter ... with respect to a consumer credit transaction secured by real property may be maintained against any assignee of such creditor only if—
>
> (A) the *violation* for which such action or proceeding is brought is *apparent on the face of the disclosure statement* provided in connection with such transaction pursuant to this subchapter; and

(B) the assignment to the assignee was voluntary.

15 U.S.C. § 1641(e)(1) (emphasis added). A "violation ... apparent on the face of the disclosure statement" is described as that which "can be determined to be incomplete or inaccurate by a comparison among the disclosure statement, any itemization of the amount financed, the note, or any other disclosure of disbursement" or which "does not use the terms or format required to be used by this subchapter." 15 U.S.C. § 1641(e)(2).

Nationwide maintains that none of the documents it received when it took the assignment indicated any of the defects demonstrated by the Debtor. N.T. 66–67. The assignor's failure to provide Nationwide with these documents supports its claim that it purchased the loan in good faith.

*Debtor Disputes Nationwide's Claim that it is a Good Faith Assignee*

Debtor disputes Nationwide's claim that it purchased the loan without notice of the TILA violations. Debtor maintains that while Nationwide may have never actually seen the two documents which Debtor offers to prove her TILA violations-the Notice of Right to Cancel (Ex. J4(a)(1) and (2)) and the 7/24/97 Contract (J1(a))-knowledge of these documents is nevertheless imputed to it. Debtor reaches this conclusion by interpreting the highlighted language above to mean the *documentation provided to Debtor* when the loan closed. The Debtor's reading is not limited to *disclosures provided to Nationwide* when it purchased the loan.

Debtor offers no case law to support this interpretation of § 1641(e). Instead, she makes two arguments. First she notes that the words "provided in" are used throughout TILA to refer to information given to the borrower. She cites six different parts of TILA where the word "pro-

vided" is used as the predicate to disclosure: §§ 1635(a), 1635(h), 1638(b)(1), 1639(a), 1639(b)(2)(A) and (B). The Debtor would have the Court conclude that the use of the same words in § 1641 is no coincidence; rather, it is an intention to charge the assignee with constructive notice of all documents given to the borrower at closing. *See* Debtor's Brief, p. 15.

But the logic of this argument simply does not hold up. Nowhere in the statute is the word "provided" endowed with some specific meaning. To the contrary, the word is used generically throughout. Moreover, all of the TILA sections cited by the Debtor deal with disclosures between the lender and borrower; § 1641 deals with assignments between lenders, an entirely different context. It would be a leap of faith to conclude that the words "provided in" of § 1641(e) includes more documents than are disclosed at the time of assignment.

The Debtor's next argument is that the same conclusion is reached by comparing § 1641(e) with § 1641(a). The Debtor points to language in subsection (a) which states that "for the purpose of this section, a violation apparent on the fact of the disclosure statement includes, but is not limited to (1) a disclosure which can be determined to be incomplete or inaccurate from the fact of the disclosure statement or *other documents assigned.*" 15 U.S.C. § 1641(a) (emphasis added). Debtor asks the Court to observe that subsection (e), which deals with loan secured by real estate, does not contain the words "documents assigned." That omission, Debtor concludes, reflects that the scope of documents to which the assignee would have constructive knowledge would extend to *all* documents disclosed to the borrower. Again, there is no authority offered to support this strained interpretation and the Court has not independently found

any. The Court therefore concludes that Nationwide qualifies as a good faith assignee entitled to the protections of TILA § 1641.

*Although Nationwide is a Good Faith Assignee, Debtor may Rescind the Contract*

■ But even finding that Nationwide purchased the loan in good faith does not preclude Debtor's rescission request. In that regard, § 1641 provides that "[a]ny consumer who has the right to rescind a transaction under section 1635 of this title may rescind the transaction as *against any assignee* of the obligation." 15 U.S.C. § 1641(c) (emphasis added). It is the terms of rescission which are problematic.

■ The Debtor, of course, requests that the mortgage and the underlying debt be voided outright. *See* Debtor's Brief, p. 21. In this respect, the Debtor correctly points out that TILA gives courts the power to regulate the manner in which a consumer may exercise the right of rescission. 15 U.S.C. § 1635(b); 12 C.F.R. § 226.23(d)(4).

§ 1635(b) provides:

When an obligor exercises his right to rescind under subsection (a) of this section, he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such a rescission. Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, down payment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction. If the creditor has delivered any property to the obligor, the obligor may retain possession of it. Upon the performance of the creditor's obligations under this section,

the obligor shall tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the obligor shall tender its reasonable value ...

15 U.S.C. § 1635(b)(emphasis added).

Regulation Z provides:

(1) When a consumer rescinds a transaction, the security interest giving rise to the right of rescission becomes void and the consumer shall not be liable for any amount, including any finance charge.

(2) Within 20 calendar days after receipt of a notice of rescission, the creditor shall return any money or property that has been given to anyone in connection with the transaction and shall take any action necessary to reflect the termination of the security interest.

(3) If the creditor has delivered any money or property, the consumer may retain possession until the creditor has met its obligation under paragraph (d)(2) of this section. When the creditor has complied with that paragraph, the consumer shall tender the money or property to the creditor or, where the latter would be impracticable or inequitable, tender its reasonable value ...

12 C.F.R. § 226.23(d).

■ The large majority of courts hold that this power enables them to condition the avoidance of a creditor's security interest on the return of its property by the consumer. *Williams v. Homestake Mortgage Co.*, 968 F.2d 1137, 1142 (11th Cir.1992); *F.D.I.C. v. Hughes Development Co.*, 938 F.2d 889, 890 (8th Cir.1991), *cert. denied sub nom. Hughes Development Co. v. Great Plains Capital Corp.*, 502 U.S. 1099, 112 S.Ct. 1183, 117 L.Ed.2d 426 (1992); *Rudisell v. Fifth Third Bank*, 622 F.2d 243, 254 (6th Cir.1980); *La Grone v. Johnson*, 534 F.2d 1360, 1362 (9th Cir.

1976); *Powers v. Sims and Levin*, 542 F.2d 1216, 1221–22 (4th Cir.1976); *Aquino v. Public Finance Consumer Discount Co.*, 606 F.Supp. 504, 508–09 (E.D.Pa.1985); *In re Buckles*, 189 B.R. 752, 766 (Bankr. D.Minn.1995); *In re Lynch*, 170 B.R. 26, 29–30 (Bankr.D.N.H.1994). The purpose of rescission as a remedy is to undo a transaction and place the parties in the same position they would occupy had the transaction not occurred. *E.g. Williams*, 968 F.2d at 1140. As most courts have found, this goal must at times be accomplished by appropriately conditioning the avoidance of the creditor's security interest on the return of its property. *Id.* at 1142 ("we hold that a court may impose conditions that run with the voiding of a creditor's security interest upon terms that would be equitable and just to the parties in view of all surrounding circumstances").

A distinct minority of courts have issued opinions in which they declined to condition the rescission of a lending transaction on the return of property by the debtor. *In re Celona*, 90 B.R. 104 (Bankr.E.D.Pa. 1988) *affirmed* 98 B.R. 705 (E.D.Pa.1989); *In re Piercy*, 18 B.R. 1004 (Bankr.W.D.Ky. 1982). These decisions were issued in the context of bankruptcy proceedings and resulted in the creditor's claim becoming unsecured. Significantly, however, these cases involved relatively small sums of money. The loan at issue in *Piercy* totaled $6,819.93 and in *Celona* only $5,197.50 was at stake.

This Court has dealt with this issue before. *See In re Apaydin*, 201 B.R. 716 (Bankr.E.D.Pa.1996). In *Apaydin*, this Court refused to accept the proposition that the strict enforcement of TILA justified rendering a debt in excess of $450,000 unpaid and completely unsecured. Even though the defendants there had engaged in flagrant violations of TILA, automatically relegating their entire claim to unse-

cured status would have been an utterly disproportionate and completely inequitable penalty. The Court accordingly conditioned the avoidance of the lender's security interest on the return of its money by the plaintiffs. *Id.* at 724.

For her part, the Debtor would be satisfied if the Court would follow the *Apaydin* model so long as its tender requirement is adjusted as follows:

| | |
|---|---|
| Value of Work Performed | $ 9,771.30 |
| Less: | |
| Costs of Needed Repairs | $( 2,062.50) |
| Amounts Paid by Debtor | $( 3,915.72) |
| Actual and statutory damages | $(19,086.20) |
| TILA damages for failing to comply with rescission request | $( 2,000.00) |
| Tender due Nationwide | $ 0 |

*See* Plaintiff's Post–Trial Brief, pp. 21–22. Under the Debtor's calculus, there would be nothing tendered to Nationwide because the sum of the offsets exceeds the value of the work performed. What follows is an analysis of each of the Debtor's proposed deductions.

The Debtor's valuation for the home improvements ($9,771.30) is supported by her expert witness, Alden Blyth. Mr. Blyth is an architect specializing in low income housing. He testified to what was generally shoddy and superficial work. *See* N.T., pp. 16–30. His expert report is admitted at J5 and is uncontradicted.

The next deduction would be the costs of repairs necessary to the work performed. Mr. Blyth's report states that additional electrical, HVAC and roof work is required. The total cost of this work would be approximately $2062.50. *See* J5, pp. 1, 5; N.T. 28. The Court finds this deduction warranted.

Debtor would also have the Court deduct all amounts paid on the contract to date. Having made monthly payments of $326.31 from October 1997 through September 1998, Debtor paid $3915.72 to Nationwide. This calculation is consistent with the amount of the arrearage stated in

Nationwide's Notice of Intent to Foreclose. *See* Ex. J13. Accordingly, this amount may be deducted as well.

Debtor would next have the Court deduct $19,086.20 [10] which is alleged to constitute "actual and statutory damages for which Classic is liable," and another $2000 in statutory damages for Nationwide's refusal to rescind. (*See* Debtor's Brief, p. 22). These proposed deduction are problematic and warrant analysis regarding what damages, if any, Debtor may recover, by recoupment or otherwise, when a loan is rescinded.

*Rescission and Actual Damages*

■■■■ As a general principle, the rescission of an agreement precludes an award of actual damages. *See In re Steinbrecher*, 110 B.R. 155, 159 (Bankr.E.D.Pa. 1990); *In re Barber*, 266 B.R. 309, 320 n. 20 (Bankr.E.D.Pa.2001); *In re Murray*, 239 B.R. 728, 735 (Bankr.E.D.Pa.1999); *Dollar Systems, Inc. v. Avcar Leasing System, Inc.*, 673 F.Supp. 1493, 1503 (C.D.Cal.1987), *rev'd in part on other gnds*, 890 F.2d 165 (9th Cir.1989); *Matter of Hummel*, 23 B.R. 8, 11 (Bankr.W.D.Mo. 1982). When the imposition of the rescission remedy removes any potential harm to the borrower, and no prior harm prior to rescission occurred, there can be no recovery for actual damages. *Steinbrecher, Id.*

Any actual damages here would stem from Classic having increased the number of months Debtor had to repay the loan, as well as the monthly payment. But the amount of actual damages is negligible. Debtor made only 12 payments so she never paid any of the extra 60 payments added by the 7/30/97 Contract.[11] And the second quoted monthly payment amount

was only $1.31/mth more than the first. That makes her actual damages just $16.12.[12]

*Rescission and Statutory Damages*

■■■■ However, the rescission claim would not necessarily preclude an award of statutory damages. Even if the borrower can demonstrate no actual damages, statutory penalties are applied regardless of whether the borrower was misled or injured. *See Steinbrecher, supra* at 161; *see also Griggs v. Provident Consumer Discount Co.*, 680 F.2d 927, 932–33 (3d Cir.), *vac'd on other gnds*, 459 U.S. 56, 103 S.Ct. 400, 74 L.Ed.2d 225 (1982). These statutory penalties provide an incentive for the private enforcement of TILA. *Id.*

*Is the Debtor Entitled to Both a TILA Rescission and Damage Award?*

■■■■ Debtor requests an additional $2000 in statutory damages for the Defendant's refusal to honor her rescission request. *See* Brief, p. 22. It has been held in this district that the rescission and damage remedies under TILA are not cumulative. Since the failure to honor a valid rescission demand is itself a TILA violation giving rise to statutory damages, 15 U.S.C. § 1640(a)(3), a consumer who is entitled to rescission may also recover a statutory damage award for the creditor's failure to rescind voluntarily. *See Newton v. United Companies Financial Corp.*, 24 F.Supp.2d 444, 451 (E.D.Pa.1998).

*Is Nationwide, an Assignee, Liable for Statutory Damages? May She Recover Them?*

■■■■ As to who is liable for TILA statutory damages, the statute provides as follows:

---

**10.** How this amount is derived is not explained.

**11.** Again, when Classic returned to the Debtor's house to close the deal, the number of

monthly payments were increased from 180 to 240.

**12.** $1.31/mth × 12 months = $16.12.

[A]ny *creditor* who fails to comply with any requirement under this part ... with respect to any person is liable to such person in an amount equal to the sum of–

(2)(A)(i) in the case of an individual action twice the amount of any finance charge in connection with the transaction, ... (iii) in the case of an individual action relating to a credit transaction not under an open end credit plan that is secured by real property or a dwelling, not less than $200 or greater than $2,000;

(3) in the case of any successful action to enforce the foregoing liability or in any action in which a person is determined to have a right of rescission under section 1635 of this title, the costs of the action, together with a reasonable attorney's fee as determined by the court;

15 U.S.C. § 1640(a)(emphasis added).

The Debtor would only be able to obtain relief other than rescission against a "creditor." The term "creditor" is defined in § 1602(f) as referring only to an entity which

both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the [entity to which] the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness....

15 U.S.C. § 1602(f).

Classic, not Nationwide, was the entity initially payable on plaintiff's loan. As such, Classic, not Nationwide, is the only "creditor" involved in the transaction. *See Brodo v. Bankers Trust Co.,* 847 F.Supp. 353, 359 (E.D.Pa.1994) ("Apparently Congress did not wish to impose liability for damages and attorney's fees on an assignee who was not responsible for and who had no notice of TILA disclosure violations at the time of an assignment."). Nationwide would not be liable for TILA actual or statutory damages and therefore the Debtor may not reduce its tender requirement on that basis. Accordingly, the court holds preliminarily [13] that as a condition to rescission, the Debtor must tender to Nationwide the value of the home improvements ($9771.30) less the cost of needed repairs ($2062.50) and amounts paid to date ($3915.72). Classic will be found liable for $16.12 in actual damages, $2000 in statutory TILA damages, and $2000 for its refusal of a valid rescission request. Classic shall also be found liable for attorney's fees, but as the amount requested is presently unliquidated, Debtor may press her claim for attorney's fees at a subsequent evidentiary hearing if she so chooses. *See* 15 U.S.C. § 1640(a)(1)(2)(A), and (3).

### Count II—ECOA

■ This Count raises, alternatively [14], claims under the Equal Credit Opportunity Act, 15 U.S.C. § 1691 et seq. Specifically, it is alleged that Classic stated credit terms in the 7/24/97 Contract only to change them in the 7/30/97 Contract without proper notice in violation of § 1691(d). *See* Complaint, ¶ 51. That section provides that:

(1) Within thirty days or such longer reasonable times as specified in regulations of the Board for any class of credit

---

**13.** The Court's calculation here does not foreclose the possibility of other deductions arising out of liability of Nationwide as to other counts pleaded.

**14.** This count asks for relief under ECOA only if there remains a tender requirement due Nationwide after all allowed deductions. *See* Debtor's Brief, pp. 22–23.

transaction after receipt of a completed application for credit, a creditor shall notify the applicant of its action on the application.

(2) Each applicant against whom *adverse action* is taken shall be entitled to a statement of reasons for such action from the creditor [15]. A creditor satisfies this obligation by–

(A) providing statements of reasons in writing as a matter of course to applicants against whom adverse action is taken; or

(B) giving written notification of adverse action which discloses (i) the applicant's right to a statement of reasons within thirty days after receipt by the creditor of a request made within sixty days after such notification, and (ii) the identity of the person or office from which such statement may be obtained. Such statement may be given orally if the written notification advises the applicant of his right to have the statement of reasons confirmed in writing on written request.

15 U.S.C. § 1691(d)(1) and (2) (emphasis added).

Debtor alleges that the 7/24/97 Contract was a loan application which was denied. Complaint, ¶ 49. That denial constituted an adverse action triggering the above notice provision. Complaint, ¶ 50. Classic's failure to provide that notice is the basis for Debtor's ECOA claim.

At first blush, the terms of the 7/30/Contract appear to constitute an "adverse action." The statute defines the term "adverse action" as "a *denial or revocation of credit,* a *change in the terms of an existing credit arrangement,* or a refusal to grant credit in substantially the amount or on

substantially the terms requested...." 15 U.S.C. § 1691(d)(6)(emphasis added). But this broad definition is not the end of the matter, for the implementing Regulation B refines and narrows the definition of "adverse action" by excluding from the set of such actions denials of credit that are coupled with counteroffers that are accepted. *See* 12 C.F.R. § 202.2(c)(1)(i). *See also Diaz v. Virginia Housing Development Authority,* 117 F.Supp.2d 500, 504 (E.D.Va.2000) (holding that denial coupled with counteroffers are also excluded from ECOA's written notice requirement, where the applicant accepts the counteroffer). The terms of the 7/30/97 Contract would thus not appear to be "an adverse action" under ECOA.

Debtor's second ECOA argument fares better. She alleges that the lender failed to provide her with a correct disclosure for a notice of counteroffer within thirty days. *See* Complaint, ¶ 51 Again, ECOA requires that "[w]ithin thirty days... after receipt of a *completed application* for credit, a creditor shall notify the applicant of its action on the application." 15 U.S.C. § 1691(d)(1) (emphasis added).

The regulations define a "completed application" as:

an application in connection with which a creditor has received all the information that the creditor regularly obtains and considers in evaluating applications for the amount and type of credit requested (including but not limited to, credit reports, any additional information requested from the applicant, any approvals or reports by governmental agencies or other persons that are necessary to

---

**15.** The term "creditor" means "any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of

credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit." 15 U.S.C. § 1691a(e).

guarantee, insure, or provide security for the credit or collateral).

12 C.F.R. § 202.2(f). As Classic has not appeared in this case to defend its action, there is no indication that the information it obtained from the Debtor at their first meeting was insufficient for its decision not to extend credit consistent with the terms provided in the 7/27/97 Contract. Accordingly, the Court finds that the 7/24/97 Contract is a "completed application" for purposes of ECOA.

And as to completed applications, Regulation B requires that written notice be given if the lender makes a counteroffer: "A creditor shall notify an applicant of action within . . . 30 days after receiving a completed application concerning the creditor's approval of, counter offer to, or adverse action on the application." 12 C.F.R. § 202.9(a)(1)(i). Thus, under ECOA there are three distinct kinds of action a creditor might take, each triggering a notice requirement: an approval, a counteroffer, and an adverse action. *Newton, supra,* 24 F.Supp.2d at 459.

A counter offer is an offer to extend credit in a different amount, or on other terms, than the terms requested. 12 C.F.R. § 202.2(c)(1)(i). The 7/30/97 Contract did just that: it offered credit but in a different amount and on different payment terms. While for some purposes a counteroffer is a kind of adverse action (*see* 15 U.S.C. § 1691(d)(6) (term "adverse action" includes "a refusal to grant credit in substantially the amount or on substantially the terms requested")), Regulation B imposes different notice requirements on counteroffers and adverse actions. *Compare* Model Forms C–1, C–2, C–3 (sample notice of adverse action) with Form C–4 (sample notice of counteroffer), Appendix C to Regulation B. Notice of an approval can be implicit, by granting the credit requested. Official Staff Commentary, § 202.9(a)(1)-(2). There is no provision, however, for implicit notice of either an adverse action or a counteroffer. Classic's failure to give the required notice of counteroffer constitutes a violation of ECOA. A creditor found to commit an ECOA violation is liable for actual damages sustained by the borrower. *See* 15 U.S.C. § 1691e(a). In this case, actual damages sustained by the Debtor would be the same amount sustained as a result of the TILA violation, $16.12. And that same creditor may be liable for a reasonable attorney's fee. *See* 15 U.S.C. § 1691e(d). Again, the question of the amount of attorney's fees for which Classic is liable may be determined at a subsequent hearing.

*Are Mego and Nationwide Liable Under ECOA as Assignees?*

■ This Count is vague as to who exactly committed the ECOA violations. The Debtor uses the term "lender" throughout to described the culpable party. *See* Complaint, ¶¶ 48–51. It is only in the Debtor's prayer for relief that she asks the court to find the "Defendants" liable. Having already concluded that Classic committed ECOA violations, are Mego and Nationwide also liable?

The statute refers to a creditor as the relevant actor. *See* 15 U.S.C. § 1691(d)(2). It defines "creditor" as:

> [A]ny person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit.

15 U.S.C. § 1691a(e).

At first glance, this definition would appear to apply to the other defendants. But ECOA's implementation regulation (Regulation B) narrows the field:

A person is not a creditor regarding any violation of the act or this regulation committed by another creditor unless the person knew or had reasonable notice of the act, policy, or practice that constituted the violation, before becoming involved in the credit transaction. 12 C.F.R. § 202.2(*l*)

Debtor asserts that Nationwide had knowledge of the ECOA violations. In her brief, she states that "Nationwide received copies of both the 7/24/97 Contract and the 7/30/97 Contract in its assignment file." Debtor's Brief, p. 23. But Nationwide testified that the documents it reviewed did not show any defects. N.T. 66–67. Given the limited evidentiary record on this point, a review of the burden of proof is required.

 The case law and legislative history of the ECOA establish that in general the burden of proof in ECOA cases is similar to that in Title VII employment discrimination cases. *See e.g. Bhandari v. First National Bank of Commerce,* 808 F.2d 1082, 1100 (5th Cir.) (language of the ECOA is "closely related to that of Title VII of the Equal Employment Opportunity Act ('EEOA'), 42 U.S.C. § 2000e–2, and was intended to be interpreted similarly"), *aff'd in part and modified in part on other grounds on rehearing by court en banc,* 829 F.2d 1343 (5th Cir.1987), cert. granted, judgment vacated and matter remanded, 492 U.S. 901, 109 S.Ct. 3207, 106 L.Ed.2d 558, *en banc decision reinstated,* 887 F.2d 609 (1989), *cert. denied,* 494 U.S. 1061, 110 S.Ct. 1539, 108 L.Ed.2d 778. Under this approach the plaintiff has the initial burden of presenting a prima facie case of credit discrimination. If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant to articulate some legitimate, non-discriminatory basis for its action. Finally, should the defendant carry this burden, the plaintiff

then has the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were merely a pretext for discrimination. *Texas Dept. of Comm. Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981) (internal citation omitted). Throughout this process, however, the ultimate burden of persuasion remains with the plaintiff. *Id.* at 253, 101 S.Ct. at 1093.

Debtor has established that Classic has violated ECOA, but liability will be imputed to Nationwide only if it knew of the violations beforehand. But exactly how Nationwide is to have known of the violations is not explained. The record is conspicuously devoid of evidence on this point. This stands in some contrast to similar allegations in a recent case addressing the same issue:

> [P]laintiffs contend that Bank of America is an assignee in name only. As evidence, plaintiffs note that Bank of America determines a customer's creditworthiness and sets the Buy Rate for the automobile loans, as well as the maximum Markup that a dealer may apply to a customer's loan. Plaintiffs further note that dealers process the loans in accordance with Bank of America's policies and procedures; that Bank of America, rather than the dealer, bears the risk of default from the moment the loan is approved; and that Bank of America compensates dealers for originating loans by rebating to them a portion of the markup. Plaintiffs assert that, under these circumstances, Bank of America may be deemed the originating creditor for purposes of the ECOA The court agrees. *Cf. Ford Motor Credit Co. v. Cenance,* 452 U.S. 155, 158, 101 S.Ct. 2239, 2241, 68 L.Ed.2d 744 (1981) ("The sales were contingent upon FMCC's ap-

proval of the credit worthiness of the buyer. The acceptance of the contract and the assignment became operational simultaneously, and the assignment divested the dealer of any risk in the transaction. In short, we agree with the Court of Appeals that it would be elevating form over substance to conclude that FMCC is not a creditor within the meaning of the [Truth in Lending] Act.")

*Osborne v. Bank of America, N.A.,* 234 F.Supp.2d 804, 808–09 (M.D.Tenn.2002)

The court in *Osborne* had before it an evidentiary record demonstrating the assignee was integrated into the initial loan process. This provided the basis for concluding that the lender was more than an arms length assignee. That is not the case here. The Court knows very little about the business practices of Nationwide. With regard to the purchase of this loan Nationwide testified that it was contacted by Mego about purchasing it and that it had expressed interest. N.T. 66. As to how Nationwide generally decides to purchase loans, there is no evidence whatsoever.

And as to specific knowledge on Nationwide's part, there is no discussion of exactly how or why Nationwide knew of these violations. *Compare Osborne, supra* ("Additionally, plaintiffs have adequately alleged that Bank of America had reasonable notice of the racially discriminatory effects of dealers' subjective Markups, thereby rendering the Multiple Creditor Rule inapplicable."); *see also United States v. Cello–Foil Products, Inc.,* 100 F.3d 1227, 1233 (6th Cir.1996) ("[K]nowl-

edge, like intent, is a factual issue which may be proved by circumstantial evidence.") Debtor maintains that Nationwide saw the 7/24/97 contract in its assignment file. But, again, Nationwide's representative credibly testified precisely to the contrary. N.T. 66–67. Debtor has not proven that Nationwide purchased the loan knowing of the ECOA violation. Accordingly, it is not charged with creditor status and will not be held liable under ECOA.

### *Count III—UDAP*

This count alleges a series of violations of the Unfair Trade Practices and Consumer Protection Law [16] (UDAP). The alleged violations are both vicarious and specific in nature. The indirect violations of UDAP are supposed to have occurred when the Defendants violated the Home Improvement Finance Act [17] (HIFA), ECOA, and TILA. *See* Complaint, ¶ 55, 58, and 63. In addition, it is averred that Classic directly violated UDAP by denying Debtor her right to rescind and by giving her an incomplete disclosure form regarding that right. *See* Complaint ¶¶ 59–61.

### *Is This Transaction Covered by HIFA?*

For HIFA to apply, the Debtor must demonstrate that a "home improvement installment contract" is involved. A "home improvement installment contract" is defined as "an agreement covering a *home improvement installment sale.*" 73 P.S. § 500–102(10) (emphasis added). In turn, a home improvement installment sale is defined as "the sale of goods and furnishing of services or the furnishing of

---

**16.** 73 P.S. § 201–1 et seq. Like most American jurisdictions, Pennsylvania has enacted a statute which is generically known as a law prohibiting and punishing "unfair or deceptive acts and practices," i.e., a UDAP statute, specifically the Unfair Trade Practices and Consumer Protection law, 73 P.S. § 201–1, et seq. (referred to hereafter as "UDAP").

**17.** 73 P.S. § 500–200 et seq. A violation of HIFA has been held to be a *per se* violation of UDAP. *See In re Russell,* 72 B.R. 855, 869–871 (Bankr.E.D.Pa.1987); *accord In re Wylie,* 1991 42236 *5 (E.D.Pa.); *In re Murray,* 239 B.R. 728, 732 (Bankr.E.D.Pa.1999)

services by a contractor to a retail buyer pursuant to a home improvement installment contract wherein the cash price is stated to be in excess of three hundred dollars ($300)." 73 P.S. § 500–102(11). And finally, a contractor is defined as "a person who sells goods and services, or agrees to furnish or render goods and services to a retail buyer pursuant to a home improvement installment contract." 73 P.S. § 500–102(9).

*Was this a Home Improvement Installment Sale?*

There can be no doubt that the subject matter of this contract involved home improvements. The contract refers to work to be done on the Debtor's kitchen and bathroom. The cost of that work exceeds the threshold amount. *See* J2.

*Has the Debtor Alleged that a Contractor Arranged the Financing?*

A cause of action under HIFA requires a contractor to both *finance* and perform home improvements. *In re Cabbagestalk,* 270 B.R. 33, 37 (Bankr.W.D.Pa.2001) (emphasis added). Here, Classic is listed as the lender on the Home Improvement Contract. *See* J1–a and J2a. Consequently, it provided the financing as well as the work for this job. The Court may safely conclude that this is a transaction covered under HIFA.

*Has Debtor Demonstrated HIFA Violations?*

 Regarding this count, HIFA provides that:

No person shall charge, collect or receive from any buyer, directly or indirectly, any further or other amount for costs, credit investigation charges, insurance premiums, examination, appraisal, service, brokerage, commission, interest, discount, expense, fee, fine, penalty or other thing of value in connection with a *home improvement installment contract*

other than the charges authorized by this act. Any such unauthorized charge shall be unenforceable. Any payment thereof shall be applied to the next maturing installment, or, if the contract has been fully paid, remitted to the buyer and the buyer shall be entitled to recover all such unauthorized charges.

73 P.S. § 500–407 (emphasis added).

Specifically, Nationwide is alleged to have violated HIFA by charging consumer fees, costs, commissions, or other charges not authorized the act. *See* Complaint, ¶ 54. But exactly what illegal fees Debtor was charged is not explained. The Court is left to divine that for itself.

A clue may be found in the Complaint where Debtor maintains that it is entitled to recover treble damages "for the violations described [in ¶ 54] in the amount of the excess charges paid, plus reasonable attorney's fees and costs. 41 P.S. §§ 502, 503; 73 P.S. § 201.9.2." *See* Complaint ¶ 56. This may be a reference to HIFA's limitation on finance charges:

(a) The maximum finance charge included in a closed-end home improvement installment contract payable in substantially equal successive monthly installments beginning one month from the date the finance charge accrues, shall not exceed eight dollars ($8) per one hundred dollars per annum. Such finance charge shall be computed on the principal amount financed on the contract notwithstanding that the time balance is required to be paid in installments. The finance charge shall not accrue over a longer period than one which commences on the date of substantial completion of the contract and ends on the date when the final installment is payable. For a period less or greater than twelve months or for amounts less or greater than one hun-

dred dollars ($100), the amount of the maximum finance charge shall be increased or decreased proportionately. A fractional monthly period of fifteen days or more may be considered a full month. If the finance charge computed as above provided is less than twelve dollars ($12), a minimum finance charge of twelve dollars ($12) may be made. With regard to open-end home improvement installment agreements, the maximum finance charge shall not exceed one and twenty-three one hundredths per cent on the outstanding balance from month to month.

73 P.S. § 500–301(a).

HIFA limits finance charges to "eight dollars ($8) per one hundred dollars per annum ... computed on the principal amount of the contract...." 73 P.S. § 500–301(a). Assuming that $24,795.00 were the "principal amount of the contract" for purposes of HIFA, the maximum finance charges payable under the HIFA would have been $39,960.00.[18] The Contract lists a finance charge of $53.519.40. *See* Ex. J2–a. That would appear to be the HIFA violation complained of. A violation of HIFA has been held to be a *per se* violation of UDAP. *See In re Russell,* 72 B.R. 855, 869–871 (Bankr.E.D.Pa.1987); *accord In re Wylie,* 1991 WL 42236 *5 (E.D.Pa.); *In re Murray,* 239 B.R. 728, 732 (Bankr.E.D.Pa.1999).[19]

*Is Nationwide Liable Under UDAP as an Assignee?*

In its pleadings and brief, Debtor maintains that Nationwide is liable to Debtor for Classic's UDAP violations. It offers two arguments in support of this position: first, that HIFA provides for liability for any claims and defenses against the as-

signee unless the assignee notifies the buyer that it has 15 days to inform the assignee of its claims or defenses; and second, that Nationwide is liable in accordance with the Federal Trade Commission's regulation regarding holders in due course. *See* Complaint, ¶ 57; Plaintiff's Post–Trial Brief, p. 25.

*Are Debtor's Rights as to Nationwide Preserved?*

■ HIFA provides the following with regard to assignment:

No right of action or defense arising out of the transaction which gave rise to the home improvement installment contract which the buyer has against the contractor, and which would be cut off by assignment, shall be cut off by assignment of the contract to any third person whether or not he acquired the contract in good faith and for value unless the assignee gives notice of the assignment to the buyer as provided in this section and within fifteen days of the mailing of such notice receives no written notice of the facts giving rise to the claim or defense of the buyer.

73 P.S. § 500–208.

The record is devoid of documentary proof that Nationwide ever notified the Debtor in writing of the assignment. The only evidence on that point is Nationwide's representative who testified that Debtor "called in saying she understood that [Nationwide] were now the owners of the loan, that she was interested in making payments." N.T. 67. There is no evidence that Nationwide followed the specific notice of assignment procedure set forth in section 500–208:

---

**18.** That sum is derived as follows: $24,975 ×.08 = $1998; $1998/yr × 20 yrs = $39,960.

**19.** Having found a UDAP violation on this basis, the Court need not examine whether UDAP is otherwise violated.

A notice of assignment shall be in writing addressed to the buyer at his address shown on the contract and shall indicate or contain: The name and address of the assignee, the names of the contractor and the buyer and a description of the goods and services which are the subject matter of the contract, the time balance of the contract, the number and amount of installments in which the time balance is payable and the due date or period thereof, together with the following legend printed or written in a size equal to at least eight point bold type:

Notice:

1. If the within statement of your transaction with the contractor is not correct in every respect; or

2. If the goods and services described in or in an enclosure with this notice have not been delivered and satisfactorily performed by the contractor; or

3. If the contractor has not fully performed all his agreements with you, you must notify the assignee in writing at the address indicated in or in an enclosure with this notice within fifteen days from the date of the mailing of this notice; otherwise, you will have no right to assert against the assignee any right of action or defense arising out of the sale which you might otherwise have against the contractor.

*Id.* This section dictates the exact language which must be in the notice. Yet there is no evidence that written notice of any sort, much less a writing containing the required language, was ever given.

**20.** Having found that Nationwide is liable as an assignee on the basis of HIFA section 500–208, we need not address Debtor's alternative argument that the FTC's holder in due course regulation also makes Nationwide liable.

Consequently, Debtor's HIFA claim is preserved as against Nationwide.[20]

*What Damages Are Recoverable for a HIFA Violation?*

■■■ As to damages under HIFA, we note first that its sole means of enforcement is through the State Attorney General or District attorney there is no direct right in favor of a private litigant. *Engle v. Shapert Constr. Co.,* 443 F.Supp. 1383 (M.D.Pa.1978); *see* 73 P.S. 500–501, 500–502. However, because a violation of HIFA qualifies as an unfair method of competition under UDAP,[21] the Court may look to UDAP for a remedy. In that regard, UDAP provides:

Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act, may bring a private action to recover actual damages or one hundred dollars ($100), whichever is greater. The court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars ($100), and may provide such additional relief as it deems necessary or proper.

73 P.S. § 201–9.2(a).

■■■ Given that the loan may be rescinded, no award of actual damages would be appropriate. However, the Court finds that a statutory damages award of $100 is warranted. *See* 73 P.S. § 201–9.2. That amount will further offset the Debtor's tender requirement.

**21.** *See In re Russell,* 72 B.R. 855 (Bankr. E.D.Pa.1987).

As to whether Debtor is entitled to attorney's fees for Nationwide's HIFA/UDAP violation, such relief is within the court's discretion. *See Sewak v. Lockhart*, 699 A.2d 755 (Pa.Super 1997); *Wallace v. Pastore*, 742 A.2d 1090 (Pa.Super.1999); *Neff v. GMC*, 163 F.R.D. 478 (E.D.Pa. 1995). Again, a request for an award of attorney's fees against Classic may be raised at a subsequent hearing.

### Count IV—Breach of Contract

Debtor's fourth count alleges that Classic breached its contract with the Debtor by either not performing all the work required or performing it in an unworkmanlike manner. *See* Complaint ¶ 66. Under Pennsylvania law, in order to prove a breach of contract claim "a plaintiff must show: (1) the existence of a valid and binding contract to which the plaintiff and defendants were parties; (2) the contract's essential terms; (3) that plaintiff complied with the contract's terms; (4) that the defendant breached a duty imposed by the contract; and (5) damages resulting from the breach." *Nowosad v. Villanova Univ.*, 1999 WL 322486, at * 6 (E.D.Pa.)(*citing Gundlach v. Reinstein*, 924 F.Supp. 684, 688 (E.D.Pa.1996))

#### Did the Parties have a Contract?

From the documents admitted as Ex. J1–a and J2–a, the parties appear to have established a contract. J1–a itemized all of the home improvements to be done to Debtor's home. That document also sets forth how the Debtor will pay for that work and when. The exact terms of payment, the amount and dates of payment, would be modified in J2–a, but the agreement is otherwise the same. A threshold level of integration of terms appears to have been met here.

#### Did Plaintiff Perform, and Did Classic Commit a Material Breach Under the Contract?

Debtor's sole requirement under the Contract was to make the agreed monthly payment. This she did until October 1998. But well before this time Classic had done what work it would do and then was not heard from again. And the work was substandard at best. The testimony of Debtor's expert witness, Mr. Blyth, confirms this, as well as the need to spend more money to do the job right. *See* Ex. J–5; *see also* N.T. pp. 20–30. A breach of this magnitude is sufficiently material to excuse performance on Debtor's part. *See In re Sugarhouse Realty, Inc.*, 1995 WL 114151 *29 (Bankr.E.D.Pa.)

#### Damages Sustained By Debtor

Based on Mr. Blyth's report, the Court concludes that Debtor received substantially less than the benefit of the bargain. Add to that the additional expenditure required to fix the defects and it is clear that Debtor sustained damages on account of Classic's failure to perform. However, Debtor does not ask for an affirmative award of damages. Rather, she presses that claim negatively, to offset the value of the work performed on her house. The Court has already factored the cost of necessary remedial work into the Debtor's tender requirement in Count I.

### Count V—Unconscionability

The fifth count alleges that the contract is so one-side and unfavorable to the Debtor as to be unconscionable. *See* Complaint, ¶ 70. As to a contract, unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties, together with contract terms which are unreasonably favorable to the other party. *See Schrack v. Eisenhower*, 1995 WL 610260 *3 (Pa.Com.Pl.). The determination of whether a contract is unconscionable is a

question of law for the court. *Koval v. Liberty Mutual Insurance Company*, 366 Pa.Super. 415, 425, 531 A.2d 487, 491 (1987), *appeal denied*, 518 Pa. 619, 541 A.2d 746 (1988).

■ The Debtor does not demonstrate how the transaction offered her no choice. While Classic indeed solicited the Debtor at her house, that does not mean she could not have looked elsewhere to have the same work done. This moots any discussion of whether the Contract terms rise to the level of unreasonableness. Certainly, the finance charges were high, but Debtor could have simply refused to sign. There is no apparent element of adhesion in the record. Accordingly, the Debtor may not void the Contract on that basis.

### Count VI—Avoidance of Security Interest

This final count seeks relief in the alternative to rescission. It would have the Court void Nationwide's security interest based on what the Debtor claim to be "fraudulent notarization" of the mortgage. The Debtor asserts that no notary was present at the time she signed the Mortgage, making the mortgage's acknowledgment defective. Therefore, she contends, the Mortgage was not properly recorded and can be avoided by the Trustee [22] under Bankruptcy Code § 544(a). That section states, in pertinent part:

(a) The trustee shall have, as of the commencement of the case, and without

regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

. . . .

(3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser at the time of the commencement of the case, whether or not such a purchaser exists.

11 U.S.C. § 544(a)(3).

■ The property rights of the mortgagor and mortgagee are created and defined by state law and must be reviewed in light thereof. *Schwab v. Home Loan and Investment Bank, FSB (In re Messinger)*, 281 B.R. 568, 572 (Bankr.M.D.Pa.2002) (Thomas, J.) *citing Commerce Bank v. Mountain View Village, Inc.*, 5 F.3d 34, 36 (3d Cir.1993), in turn, *citing Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136, 140 (1979). In *Messinger*, the trustee also attempted to avoid a number of mortgage liens under § 544(a), claiming that the acknowledgments were defective because the mortgages had not been executed in the presence of the notary. After reviewing the language of the Uniform Acknowledgment Act,[23] Pennsylvania case law, and the histo-

---

**22.** As there is no indication that the Trustee attempted to avoid the mortgage, the Debtor seeks to do so under § 522(h). That section provides, in pertinent part:

The debtor may avoid a transfer of property of the debtor or recover a setoff to the extent that the debtor could have exempted such property under subsection (g)(1) of this section if the trustee had avoided such transfer, if—

(1) such transfer is avoidable by the trustee under section 544, 545, 547, 548, 549, or

724(a) of this title or recoverable by the trustee under section 553 of this title; and
(2) the trustee does not attempt to avoid such transfer.

11 U.S.C. § 522(h).

**23.** The Uniform Acknowledgment Act was adopted by Pennsylvania in 1941 and is codified at 21 P.S. § 291.1 et seq.

ry of acknowledgments, Judge Thomas concluded that "the presence of the parties is required, with limited exception, for a proper certificate of acknowledgment in Pennsylvania." *Messinger,* 281 B.R. at 574.

■■■■ Under Pennsylvania law, the acknowledgment does not affect the validity of the mortgage and is not part of the document. *Messinger,* 281 B.R. at 574. The acknowledgment is required for the recording and perfection of a mortgage lien. *Messinger,* 281 B.R. at 573 *citing Abraham v. Mihalich,* 330 Pa.Super. 378, 381, 479 A.2d 601, 603 (1984) and 21 P.S. § 42. The purpose of the acknowledgment is to verify the executing party's identity and voluntary intention to be bound by the terms of the document. *Messinger,* 281 B.R. at 574.

The Debtor relies on *In re Rice,* 133 B.R. 722 (Bankr.E.D.Pa.1991)(Scholl, J.), in which the Court avoided a mortgage under § 544(a), finding that the acknowledgment was defective because the debtor had not signed the mortgage in the presence of the notary. *Rice,* 133 B.R. at 728. The *Rice* Court considered the defendant's argument that 21 P.S. § 281.1, entitled "Defective acknowledgments prior to 1988," cured any defect in the acknowledgment, and concluded that the statute cures errors made by the notary or official witnessing the signature, but does not cure "an entirely bogus acknowledgment" that was never actually made before the notary or other official. *Id.* at 727. The *Rice* Court concluded that such a defect was too serious to fall within the curative effects of 21 P.S. § 281.1 because "[t]he formality of appearance before an authorized official serves the practical purpose of 'bringing home' to the mortgagor the fact that a mortgage is being executed." *Id.* at 722.

■■■■ The most recent decision on point from this district, *In re Jones,* 284 B.R. 92 (Bankr.E.D.Pa.2002) differs with *Rice* and adopts the holding of *Messinger, supra.* The *Jones* Court cited the following conclusion from *Messinger:*

> The official certificate of the notary, in regular form, is (in the absence of fraud or forgery) conclusive in favor of those who in good faith rely upon it. "Any other rule would work incalculable mischief. It would open wide the door to fraud and perjury, and make recorded acknowledgments a snare to a person dealing with land on the faith and credit of the public records." *Popovitch v. Kasperlik,* 70 F.Supp. 376, 384 (W.D.Pa. 1947). Allowing a challenge where there is an allegation of fraud or forgery would restore the protections that may have been lost by an improper fulfillment of notarial duties. Where the grantors concede that they have signed the deed, and the deed had been delivered, "even a defective acknowledgment would not be a basis for invalidating the recordation." *Abraham v. Mihalich,* 330 Pa.Super. at 382, 479 A.2d at 603.

*Jones, supra* at 96 *citing Messinger,* 281 B.R. at 574–75. Based upon the foregoing, the court in *Jones* held that Pennsylvania law requires proof of fraud or forgery to void the perfection of a recorded mortgage containing an acknowledgment that is complete and proper on its face. 284 B.R. at 96. This seems a fairer test for avoidance.

■■■ As to proof of fraud or forgery with regard to the execution of the mortgage, the evidence is scant. The Complaint alleges that at the closing the documents for her to sign " were put on top of each other in such a way that [Debtor] could not read what [Classic] was asking her to sign." *See* Complaint, ¶ 20. But the record does not reflect that. What has been proven is simply that no notary was present when the Debtor signed the mort-

gage, that the mortgage was both completed [24] and notarized sometime after closing, and that Debtor does not know the significance of a mortgage. *See* N.T. 38–40 and J–3a, b, and c. None of this, however, demonstrates that Debtor was misled as to the nature of the document entitled *mortgage*. She may have been deceived as to the acknowledgment, but as to the mortgage, it was not represented to be anything other than what it states. The record accordingly does not demonstrate a basis for avoiding the mortgage.

In sum, the Court will grant the Debtor's rescission request and will award monetary relief as to particular counts. As to Count I (TILA), the Debtor may rescind the transaction but must tender the sum of $3693.08 to Nationwide. Those TILA violations demonstrated in Count I entitle Debtor to judgment against Classic in the amount of $4016.12. As to Count II (ECOA), Debtor shall be entitled to judgment in the amount of $16.12 for ECOA violations. And while the Debtor is entitled to a money judgment in Counts III (UDAP) and IV (Breach of Contract), the amounts are already factored into the Debtor's tender requirement. Counts V (Unconscionability) and VI (Avoidance of Security Interest) have not been proven and judgment will be entered in favor of defendants and against Debtor on those counts. Finally, Debtor's Counsel may press its request for an award of attorney's fees (presently unliquidated) at a subsequent evidentiary hearing if it so chooses.

An appropriate order follows.

---

24. By completed, it is meant that the legal description of the property (not attached to Debtor's copy) is attached to the recorded mortgage. *Compare* J–3a *with* J3–(b) and (c).